**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Lance C. AUSTIN, Defendant-Appellant.**

**No. 76–4487.**

United States Court of Appeals,
Fifth Circuit.

Nov. 27, 1978.

Charles L. Sullivan, Clarksdale, Miss., for defendant-appellant.

H. M. Ray, U. S. Atty., Thomas W. Dawson, Alfred E. Moreton, III, Asst. U. S. Attys., Oxford, Miss., for plaintiff-appellee.

Before INGRAHAM, GEE and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

From June 1974 to October 1975, Lance C. Austin issued over $750,000 worth of bad checks drawn against his checking account with the Bank of Pontotoc, Mississippi (the Bank), a small-town bank with a capital structure of less than one million dollars. On October 20, 1975, Federal Deposit Insurance Corporation (FDIC) bank examiners discovered that his account was overdrawn in the amount of $499,941.42. The examiners found the Bank's capital to be so impaired that they required it to raise in excess of $200,000 in new capital or to merge with another bank in order to preserve its insured status with FDIC. The Bank chose the latter course.

On July 16, 1976, Austin and three officers of the Bank who had made it possible for Austin to maintain his account in an overdraft position were indicted for violating federal banking laws. In five counts, they were charged with aiding and abetting one another in misapplying FDIC-insured bank funds, 18 U.S.C. § 656 (1976), in making false entries in the Bank's books and reports, 18 U.S.C. § 1005 (1976), and in concealing material facts about the Bank's condition from FDIC. 18 U.S.C. § 1001 (1976).[1] One of the officers, Sarah Mc-

---

1. The sections of title 18, U.S.C. establishing these offenses are:

§ 656. Theft, embezzlement, or misapplication by bank officer or employee

Donald, the head bookkeeper, pled guilty prior to trial and testified against the remaining defendants as a prosecution witness. Austin and Stanley Faulkner, the Bank's president, were found guilty by the jury on all counts; Jimmy Stegall, vice president and head cashier, was acquitted. Austin is the only defendant before us in this appeal.

Austin contends that his convictions should be set aside for want of sufficient evidence and that a judgment of acquittal should be entered on each count. Alternatively, Austin claims that he is entitled to a new trial because a statement by the prosecutor in closing argument to the jury amounted to an improper comment on his failure to take the witness stand. We are unpersuaded by Austin's contentions and affirm his convictions.

I

■ Whether the sufficiency of the evidence is questioned on motion for judgment of acquittal made at the close of the Government's case, at the close of all the evidence, or after the return of a guilty verdict, the test is the same:[2] viewing the case in the light most favorable to the Government, could "a reasonably-minded jury . . . accept the relevant evidence as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." *United States v. Warner,* 441 F.2d 821, 825 (5th Cir.), *cert. denied,* 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971); *accord United States v. Teal,* 582 F.2d 343 (5th Cir. 1978); *United States v. Prout,* 526 F.2d 380, 384 (5th Cir.), *cert. denied,* 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 109 (1976). This test applies "whether the evidence is direct or circumstantial. [W]e must accept as established all reasonable inferences that tend to support the action of the jury, and any conflicts in the evidence must be resolved in favor of the jury verdict." *United States v. Teal,* 582 F.2d at 345 (quoting *United States v. Warner,* 441 F.2d at 825, 831).

■ At the outset we observe that Austin concedes that the Government's proof established that he issued the bad checks in

Whoever, being an officer, director, agent or employee of, or connected in any capacity with any . . . insured bank . . . willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, director, employee or receiver [shall be fined and/or imprisoned].

§ 1001. Statements or entries generally

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, [shall be fined and/or imprisoned].

§ 1005. Bank entries, reports and transactions

Whoever, being an officer, director, agent or employee of any . . . insured bank . . . makes any false entry in any book, report, or statement of such bank with intent to injure or defraud such bank, or any other company, body politic or corporate, or any individual person, or to deceive any officer of such bank, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank [shall be fined and/or imprisoned].

Section 2 of title 18 makes an aider and abettor responsible as a principal:

§ 2. Principals

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

2. The precise question whether the sufficiency of the evidence should be measured in the same way at each of these procedural steps in a case has not been addressed explicitly in our prior opinions. Certainly, there is nothing in the language of Fed.R.Crim.P. 29, or in its legislative history that would indicate that the test should differ depending on when a motion for judgment of acquittal is made. *See* Fed.R. Crim.P. 29; *United States v. Sutton,* 138 U.S. App.D.C. 208, 216, 426 F.2d 1202, 1210 (1969); 2 C. Wright, *Federal Practice and Procedure* §§ 465, 467 (1969).

question[3] and that entries were made in the Bank's records that prevented the FDIC examiners from discerning that his account was overdrawn. The shortcoming in the Government's case, he contends, lies in the absence of sufficient probative evidence to show that he intended that the Bank's funds be misapplied or that any false entries be made or other techniques be used for the purpose of hiding his overdrafts from the examiners. We are convinced that the evidence was more than adequate to demonstrate that Austin was a party to the misapplication of bank funds and that he participated in a cover up scheme with the requisite criminal intent. An examination of Austin's conduct alone, we think, makes this clear.

At the time Austin opened his account with the Bank in 1974 he was engaged in business for himself, operating as a land-clearing contractor and as an interstate trucker. He utilized one checking account for his business needs. It was in the name of "L. C. Austin, Dozier Account, Sarepta, Miss." and was the account on which all of the bad checks were written. No sooner had the account been opened than Austin began to write worthless checks. The checks were numerous and often in substantial amounts, at times in excess of $5,000. It was a rare occasion when the balance in the account was sufficient to cover a check. Nevertheless, the Bank's bookkeeper, Sarah McDonald, was under standing instructions to honor Austin's checks. She was told by the president of the Bank, Stanley Faulkner, to pay the checks and to hold them as "cash items." Under the Bank's normal procedure, she had the authority to allow an overdraft of an insubstantial amount, but upon paying the customer's check she would have been required to send him an overdraft notice immediately so that a deposit to cover the check could be made. In Austin's case, however, her instructions were to honor the check despite the amount and to ignore the overdraft notice procedure. She was simply to advise Faulkner of the overdrafts as they appeared.

This practice continued unabated except on those occasions when it was suspected that the FDIC examiners might arrive to inspect the Bank. Though the examiners came only intermittently and always unannounced, Faulkner and Jimmy Stegall, the vice president and cashier, seemed to be able to anticipate most of their visits. Whenever they sensed a visit, steps would be taken to ensure that the overdrawn condition of Austin's account and the accumulation of bad checks as cash items would not be discovered. Various methods were adopted to effect the cover up; each resulted in the establishment of deposit entries in Austin's account sufficient in amount to offset the worthless checks he had drawn. Consequently, when the examiners inspected his account they were led to believe that sufficient funds had been on deposit to pay his checks.

The first FDIC examination of concern to the defendants came in July 1974. By that time, Austin had overdrawn his account by $50,000. Checks totalling that amount had been presented to the Bank and paid. As she had been instructed, Sarah McDonald had honored the checks, without debiting Austin's account (which lacked funds to pay them), and had held the checks as "cash items,"[4] that is, as assets awaiting conversion to cash. Under normal banking practice, it was improper to treat Austin's worthless checks as cash items. Shortly

---

**3.** The checks were actually written by Austin's general manager, Marvin Avent, at Austin's direction. Record, vol. 4, at 785–86. That Austin was responsible for issuing the checks is not questioned in this appeal.

**4.** The testimony of the Government's expert witnesses established that in ordinary bank accounting and FDIC reporting a cash item is an item that is readily convertible to cash, such as checks drawn on other banks or the United States Treasury. It would also be proper for a bank to describe as a cash item a check drawn on and paid by itself, but not yet charged against the appropriate account, *provided* that the check would not create an overdraft if charged to the drawer's account. The Bank's daily cash journal contained a cash item heading under which the cash item credit and debit balances at the close of business each day were stated.

before the examiners arrived the following procedure was employed to eliminate these cash items: Austin drew a $50,000 worthless check on his account with Mechanics Savings Bank of Water Valley, Mississippi; Faulkner gave the check to Sarah McDonald with instructions to deposit it in Austin's account; and McDonald, after making the deposit, removed the bad checks from cash items and purportedly converted them to cash by charging them against the proceeds of Austin's $50,000 deposit.

Another FDIC examination was anticipated in December 1974. In preparation for the examination, which actually did not take place until the following January, these steps were taken to dispose of an accumulation of $156,000.69 worth of bad checks being carried as cash items: Faulkner, without authority and in violation of Bank policy,[5] made two $110,000 loans, one to Austin's wife and one to Austin's minor son, and deposited the proceeds of the loans in Austin's account; Sarah McDonald then eliminated the bad checks being held as cash items by charging them against Austin's account.

An FDIC examination was again anticipated in June 1975. This time $161,000 in bad checks were removed from cash items by paying them off with the proceeds of four notes totalling $161,520 that Faulkner deposited in Austin's account. The notes were obtained in this way: Faulkner gave Austin four of the Bank's form notes; Austin later returned to the Bank and presented Faulkner with the notes fully made out.

Each note was made payable to the Bank and completed with a fictitious borrower's signature.

On September 30, 1975, the Bank was required to submit to FDIC a consolidated report of the Bank's condition.[6] Faulkner and Stegall signed the report and under the heading "Cash and Due From Banks" falsely included the sum of $363,356.40, which represented the worthless checks Austin had written and the Bank had paid and was holding as cash items. The falsification of this report was alleged, in Count 2 of the indictment, to be a violation of 18 U.S.C. § 1005 (1976).

On Monday, October 20, 1975, the FDIC examiners once more appeared. This time the defendants were caught off guard; $499,941.42 worth of Austin's bad checks, 735 in number, were being held as cash items and were reflected in the Bank's daily cash journal balance for the previous business day, October 18. When the examiners left the Bank on the evening of October 20, Faulkner and Austin handled the bad checks in the following manner: Faulkner obtained $100,000 of the Bank's funds by making a false note, payable to the Bank, in the name of one of the Bank's customers[7] and deposited those funds in Austin's account. Four hundred thousand dollars was added to the account balance with the deposit of two $200,000 checks, both worthless, that Austin drew on accounts he had closed over six months earlier at Mechanics Savings Bank of Water Valley, Mississippi, and the Bank of Mantee, Mississippi.[8]

---

5. Loans in excess of $10,000 required prior approval by the Bank's loan committee and were thereafter reviewed periodically by the board of directors. Record, vol. 3, at 553–55. None of the loans involved here was ever presented to the loan committee or brought to the attention of the board of directors.

6. A Consolidated Report of Condition of Bank, FDIC form 64, is a quarterly report containing relevant data, including the presence of existing "cash items," that reflect a bank's capital condition.

7. The customer, a travelling businessman, had left a signed but otherwise incomplete note with Faulkner pursuant to a previous arrangement. It was to be filled out by Faulkner, i. e.,

the date of the note and the amount of the principal and interest were to be inserted, and delivered to the Bank only in the event the customer's account might become overdrawn. In this instance, the customer's account was not overdrawn, and therefore Faulkner had no authority to make out the note. Moreover, there was nothing in Faulkner's authority to handle the customer's affairs in this fashion that would have permitted Faulkner to deposit the note proceeds to Austin's account.

8. Actually, Austin signed the checks and gave them to Faulkner who instructed Stegall to fill them out at $200,000 each and to deposit them in Austin's account. Record, vol. 5, at 72.

Against this $500,000 in deposits, Stegall charged off the $499,941.42 in bad checks that had been carried as cash items. When the FDIC examiners returned to the Bank the next morning, October 21, to continue their work, they discovered these transactions while they were inspecting Austin's line of credit with the Bank. An investigation that lead to the indictment in this case ensued.

The revelations of October 21 formed the bases of Counts 1, 3, 4 and 5 of the indictment. For causing the Bank to pay the 735 worthless checks, the defendants were charged, in Count 1, with misapplying $499,941.42 of Bank funds in violation of 18 U.S.C. § 656 (1976). In Count 3, the defendants were charged with violating 18 U.S.C. § 1005 (1976) by making a false entry of $802,475.17 in the closing debit-column balance for cash items in the daily cash journal for October 18. The entry was alleged to be false because it included the bad check total of $499,941.42, thus overstating a Bank asset (cash items) by that amount and misleading the FDIC examiners as to the true capital condition of the Bank. In Counts 4 and 5, the defendants were charged with depositing the two $200,000 checks in Austin's account on October 20 for the purpose of concealing, in violation of 18 U.S.C. § 1001 (1976), the fact that the Bank had previously paid $499,941.42 of Austin's bad checks without charging his account.

As we observed, Austin readily admits to having issued the 735 worthless checks, totalling $499,941.42, as the FDIC examiners discovered on October 21, 1975. Moreover, he does not deny that he previously wrote, and the Bank paid, the approximately $367,-000 in bad checks not specified in the indict-ment but revealed during the Government's case. Austin vigorously contends, however, that these admissions do not permit the inference that he intended to engage in the unlawful conduct charged in the indictment: the misapplication of the Bank's funds, the false entries made in the Consolidated Report of Condition of Bank submitted to the FDIC and in the Bank's daily cash journal, and the concealment from the FDIC's examiners of the Bank's payment of $499,941.42 in worthless checks.

As for the Count 1 charge that Austin aided and abetted the misapplication of bank funds, we think the evidence of his guilt is overwhelming. We find his argument that there was nothing out of the ordinary for this small bank to have honored his worthless checks totalling some $867,000 farfetched, indeed. To be sure, it was established Bank practice to allow overdrafts, but the evidence was that the only overdrafts routinely permitted were those in small amounts. Nothing even approaching the magnitude of Austin's overdrafts was condoned. Moreover, when other customers overdrew their accounts they immediately received overdraft notices requesting payment. No such requests for payment were ever made to Austin.

Austin's modus operandi depended upon an unlimited use of the Bank's funds as if they were his own. Austin argues that he intended no injury to the Bank—he contemplated that the checks would be covered in full.[9] He does not suggest that the overdrafts were actually loans that were to be repaid, and there is no indication that loans were intended. For one thing, no interest was charged or collected; the pay-

---

9. Austin did not testify at trial, and, consequently, the jury was never given his side of the story, apart from his counsel's closing argument. The only evidence of Austin's claimed intention that the Bank should suffer no loss came from the testimony of Jimmy Stegall, who took the stand in his own defense. Stegall denied any intent to participate in the overdraft scheme and described his role as that of a Bank employee who dutifully followed his superior's (Faulkner's) instructions. He testified to a growing concern among subordinates in the Bank, including himself, as Austin's overdrafts multiplied and related that shortly before the October 20–21, 1975 FDIC examination he finally confronted Austin, demanding that the checks be paid. Austin assured him that he would take care of the checks, that he had enough jobs going to enable him to pay them off. Record, vol. 5, at 9. Nothing was done, however, save the surreptitious activity generated when FDIC examiners arrived on the scene on October 20.

ment of interest was never discussed.[10] Even assuming that the evidence permits the inference that Austin intended that, eventually, the Bank would be repaid for cashing his checks, such an intent is no defense to a prosecution for aiding and abetting the misapplication of bank funds under 18 U.S.C. § 656 (1976) or the making of a false entry in a bank record in violation of 18 U.S.C. § 1005 (1976). *Hall v. United States,* 286 F.2d 676, 681 (5th Cir. 1960), *cert. denied,* 366 U.S. 910, 81 S.Ct. 1087, 6 L.Ed.2d 236 (1961); *see Agnew v. United States,* 165 U.S. 36, 57, 17 S.Ct. 235, 243, 41 L.Ed. 624 (1897); *United States v. Southers,* 583 F.2d 1302, 1305 (5th Cir. 1978); *Benchwick v. United States,* 297. F.2d 330, 334 (9th Cir. 1961).

We are convinced that the evidence demonstrating Austin's commission of the offenses charged under 18 U.S.C. § 1005 (1976) (Counts 2 and 3) and 18 U.S.C. § 1001 (1976) (Counts 4 and 5), though not as direct as the proof establishing his participation in the misapplication of bank funds, is as compelling. The evidence is not as direct because there is nothing in the record to establish that Austin personally participated in effecting the false entries in the Bank's books or in the FDIC report, that he even knew that the entries were being made, or that he knew that his two $200,000 checks were used or for what purpose they were used. It is not necessary, however, that one charged as an aider or abettor commit the overt acts that serve to accomplish the offense or that he have knowledge of the particular means his principals (in this case the three Bank officers) employ to carry out the criminal activity. *United States v. James,* 528 F.2d 999, 1015 n. 22 (5th Cir.), *cert. denied,* 429 U.S. 959, 97

S.Ct. 383, 50 L.Ed.2d 326 (1976); *United States v. Sellers,* 483 F.2d 37, 45 (5th Cir. 1973), *cert. denied,* 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974); *Russell v. United States,* 222 F.2d 197, 198–99 (5th Cir. 1955). Criminal liability under the aider or abettor statute[11] results from the existence of "a community of unlawful intent between the [aider or abettor] and the [principal]," *Russell v. United States,* 222 F.2d at 199; an aider and abetter is "liable for any criminal act which in the ordinary course of things was the natural or probable consequence of the crime that he advised or commanded, although such consequence may not have been intended by him." *Id.* (quoting 22 C.J.S. *Criminal Law* § 92, at 164 (1940)).

As we have demonstrated above, the evidence of Austin's intent to misapply the Bank's funds is compelling. A community of unlawful intent necessarily existed between Austin and the Bank officers who knowingly made the funds available to him. Austin's criminal liability for making false entries and concealing the misapplication from the FDIC examiners emanates from his knowing participation in the check writing scheme. That the false entries and concealments were natural consequences of this scheme is evident from an admission Austin made to his business manager, Marvin Avent. Avent had reason to speak with Austin on more than one occasion about the serious overdraft situation at the Bank, which Austin seemed to take lightly. During one of their discussions on the subject, according to Avent, Austin revealed that his bankers had to maneuver things at the Bank in order to hide the situation from the examiners.[12] This admission demands the

---

**10.** Austin's dealings resulted in a substantial loss to the Bank. Shortly after the overdraft scheme was discovered by the examiners, the Bank, because of its impaired capital condition, was forced to merge with another state bank, Peoples Bank and Trust Company, Tupelo, Mississippi. As of the commencement of Austin's trial in district court on September 7, 1976, the Bank's loss had been reduced by a little over $100,000.

**11.** Quoted in note 1 *supra.*

**12.** During Avent's direct examination in the Government's case in chief, the following colloquy, dealing with the overdrafts, took place between Avent and the prosecutor:

Q: Who said he was overdrawn?
A: L. C. [Austin].
Q: Did he mention a figure?
A: Sixty to eighty thousand dollars.
Q: In what context did he make that statement about being overdrawn?

inference that Austin conferred with Faulkner regarding actions that had to be taken to cover up the misapplication of the Bank's funds.

This inference is reinforced when one considers the history of Austin's dealings with the Bank. From the very beginning he wrote overdrafts, and they grew in number and amount with the passage of time. Special arrangements not available to the other customers were made to handle his overdrafts. When these arrangements posed serious accounting problems, at least from the bank examiners' point of view, the steps taken by Austin and the Bank officers to conceal the facts and to perpetuate the scheme became more complicated and, from a criminal point of view, more serious. As we have recounted, the first device utilized to avoid the examiners' scrutiny involved the writing (by Austin) and depositing (by Faulkner and McDonald) of a rubber check in the amount of $50,000. The next time two $110,000 loans were made to provide the funds necessary to reconcile Austin's account. One of the loans was to Austin's minor son. The jury was entitled to infer that the loans were fraudulent. The Bank had already exceeded its loan limit to Austin; the loans were a ruse; and the one to the son was unenforceable. The third major ploy disclosed by the evidence had Austin present the Bank with four fictitious notes totaling $161,520. To effectuate the fourth deceptive device, the one that precipitated the Bank's collapse, Austin drew two worthless $200,000 checks on bank accounts elsewhere that he had closed months earlier, and Faulkner betrayed the trust imposed in him by one of the Bank's good customers by falsifying a $100,000 note in that customer's name. It requires no subtle analysis to conclude that these machinations embraced several common law crimes, if not offenses against the state of Mississippi and the United States, in addition to those charged

in the indictment. Any layman, much less an operator of a business the size of Austin's, would know that this conduct was in disobeyance of the law.

We note one additional argument, made by Austin in his brief but seemingly abandoned by him in oral argument, going to the sufficiency of the evidence. It is that the bookkeeping and FDIC reporting entries concerning cash items were not false because they were made in pursuance of the Bank's standard operating procedures. Whether the characterization of overdrafts as cash items was false is a question of fact for the jury. In rejecting Austin's claim that a jury issue was not presented as to the falsity of the cash items references in this case, we adopt the response of the Court of Appeals for the Fourth Circuit to the same contention:

> What is [considered] a false entry is essentially a question of fact to be found by the jury if there is a proper basis in the evidence for such finding. *All relevant circumstances are to be considered by the jury in determining whether or not a check is in fact such a cash item.* Common banking practice and the practice followed in the particular bank may be relevant. It cannot be denied *that when checks drawn against insufficient funds remain in a bank's possession overnight or for a short time pending clearance or collection, they are ordinarily treated as cash items. It does not follow that such treatment may be continued indefinitely.*

*Meredith v. United States,* 238 F.2d 535, 540 (4th Cir. 1956) (emphasis added).

In sum, we are convinced that there was sufficient evidence for a jury to find beyond a reasonable doubt that Austin aided and abetted the commission of the section 1001 and 1005 offenses charged in the indictment.

> A: It was in the—kind of laughed and in the course of a conversation which I can't recall.
>
> . . . . .
>
> Q: Do you recall a conversation with Mr. Austin wherein he again commented on his being overdrawn?

> A: Well, he made a statement one time, kind of laughing, said *when the bank auditors come* [sic] *in they had to scuffle to cover things up or to get everything in place.*
> Record, vol. 4, at 787–88 (emphasis added).

## II

At the end of his final argument to the jury, the prosecutor made the following remark in responding to the arguments of defense counsel:

> But all that we ask is that you fairly and impartially consider the evidence. Don't rush into any conclusions, jump to any conclusions one way or the other. Go in and consider it and talk about it and discuss it and see if you are convinced beyond a reasonable doubt that the charges made by the grand jury in this indictment have been proved beyond any doubt and that *these defendants have not given you any explanation whatsoever why they should be excused from the consequences of their conduct.*

Record, vol. 6, at 1325 (emphasis added). In a side-bar conference convened after the prosecutor concluded his argument, Austin moved for a mistrial on the ground that the remark constituted a comment on his failure to testify. The trial judge declared a recess, and argument on the motion was resumed in chambers. After counsel were heard, the judge opined that, taken as a whole, the remark was not a comment on Austin's failure to testify. *Id.* at 1330–31. He denied the motion and volunteered that he would be explicit in his charge to the jury in an effort to remove any prejudice that might have resulted from the remark. *Id.* A charge conference ensued. Austin requested no special curative instructions, and the court did not articulate an instruction explicitly addressed to the prosecutor's statement. The court then proceeded to instruct the jury on the law, expounding in the process on the defendant's right not to testify.[13] We are convinced, after examining the closing arguments of counsel in the light of the evidence presented to the jury, that the prosecutor's statement was not improper.

A prosecutor's reference to a defendant's silence is deemed impermissible if "it can be said that the prosecutor's manifest intention was to comment upon the accused's failure to testify [or the remark] was . . . of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Samuels v. United States,* 398 F.2d 964, 968 (5th Cir. 1968), *cert. denied,* 393 U.S. 1021, 89 S.Ct. 630, 21 L.Ed.2d 566 (1969). Of course, we must view the prosecutor's remarks in the context in which they are made, considering the circumstances of each case. *United States v. Bursten,* 453 F.2d 605, 608 (5th Cir. 1971), *cert. denied,* 409 U.S. 843, 93 S.Ct. 44, 34 L.Ed.2d 83 (1972); *see, e. g., United States v. Edwards,* 576 F.2d 1152, 1154 (5th Cir. 1978) (intent of prosecutor to comment and jury perception implied from the circumstances of that case). These principles have been employed recently in this circuit to determine whether prosecutorial remarks necessitated reversal. *United States v. Becker,* 569 F.2d 951, 964–65 (5th Cir. 1978); *United States v. Rochan,* 563 F.2d 1246, 1249–50 (5th Cir. 1977); *United States v. Dearden,* 546 F.2d 622, 625 (5th Cir.), *cert. denied,* 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977). In none of these cases did the court find that the prosecutor intended or the jury perceived that the remark in question referred to the defendant's failure to testify. Rather, the remarks, when taken in the context which they were made, were found to be permissible comments upon the failure of defense counsel, in argument, to rebut the Government's case. *United States v. Ward,* 552 F.2d 1080, 1083–84 (5th Cir.) *cert. denied,* 434 U.S. 850, 98 S.Ct. 161, 54 L.Ed.2d 119 (1977); *United States v. Hill,* 508 F.2d 345, 347 (5th Cir. 1975). We so construe the remark in question here.

The central theme of Austin's defense was that he and his codefendants were honest folk who intended no harm to the Bank. The thrust of Austin's closing argument, reflected also in the arguments of his code-

---

**13.** The jury was advised as follows:

Under our constitution, defendants have the absolute right not to testify. And when defendants exercise that right, in a criminal trial, the jury must not draw any presumption of guilt or innocence against the defend-

ants who exercise their constitutional right not to testify. That is an important right guaranteed by the United States Constitution and it must be observed in this court.

Record, vol. 6, at 1338.

fendants, was that, in this particular bank, overdrafts were allowed as a matter of course; his were simply more frequent and sizeable than any of the others. That coincidence alone, he argued to the jury, was not enough to establish criminal intent.

In the rebuttal portion of his closing argument, the prosecutor began by explaining to the jury the function to be served by defense counsel, in their final summations, and by the prosecutor, in rebuttal. He said,

> The law . . . gives *the defendants* the right to explain to you why that evidence is not sufficient to convict them, point out any defects or deficiencies in that evidence, anything that is left unproved that's necessary to reach a final just verdict in this case. And then it's my responsibility to try to answer some of the points that may have been raised by *the defense* in their arguments to you.

Record, vol. 6, at 1303–04 (emphasis added). The prosecutor then proceeded to argue that defense counsel had failed to explain away the Government's case or to point to anything in the evidence that would authorize the jury to exonerate any of the defendants. In closing, he admonished the jurors as to their function, and, in so doing, made the remark quoted above, which precipitated the motion for a mistrial.

Because a prosecutor's use of the words "these defendants" may be susceptible to various interpretations, depending upon the circumstances of the moment, *see United States v. Rochan*, we take this occasion to caution the Government that it treads dangerous waters indeed in using such language. It should not be necessary for us to remind the Government of its duty to avoid such potentially prejudicial rhetoric; the Government's overriding interest in seeing that justice is done should suffice.

In the case before us, we cannot say that the prosecutor manifestly intended to comment on Austin's failure to testify, since another explanation for his remark is obviously plausible. *See id.*, 563 F.2d at 1249. There was no allusion to testifying or taking the stand. His remark was intended to suggest that defense counsel, in their sum-

mations, had not shown any reason why the defendants should not be found guilty. We think it probable that his remark was so taken by the jury. In claiming reversible error, Austin carries the burden of demonstrating that the jury necessarily construed the prosecutor's remark as a comment on his failure to testify. *See id.* at 1250. He has not carried this burden. Just prior to stating, "these defendants have not given you any explanation whatsoever," the prosecutor had urged the jury to search the evidence for anything to support the defendants' theory of the case. Furthermore, throughout his argument, he had referred to the "defense," the "defendants," and "they," interchangeably. Austin's own attorney even referred to himself as "defendant" in alluding to his past experiences as defense counsel. In fine, we think it would be unreasonable for us to conclude that the jury in this case naturally and necessarily perceived the remark as a comment on the failure of the defendant to testify.

### III

For the reasons stated above, Austin's convictions are AFFIRMED.