827 F.2d 1182
 23 Fed. R. Evid. Serv. 1033
 UNITED STATES of America, Appellee,
v.
Newton E. COPPLE a/k/a Newt Copple a/k/a N. E. Copple, Appellant.
UNITED STATES of America, Appellee,
v.
Dana SAYLOR-ROBINSON, Appellant (Two Cases).
UNITED STATES of America, Appellee,
v.
Susan K. WILSON, Appellant.
UNITED STATES of America, Appellee,
v.
Connie E. KAHLE, Appellant.
 Nos. 85-2141 to 85-2143, 85-2270 and 86-1947.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 16, 1986.
Decided Aug. 21, 1987.
Rehearing Denied in No. 85-2141 Sept. 24, 1987.
 
 Counsel who presented argument on behalf of the appellant J. Joseph McQuillan, Omaha, Neb., for appellants Newton Copple and Connie E. Kahle.
 Timothy J. Cuddigan, Omaha, Neb., for appellant Dana Saylor-Robinson.
 Robert R. Gibson, Lincoln, Neb., for appellant Susan K. Wilson.
 Bernard J. Glaser, Asst. U.S. Atty., Lincoln, Neb., for U.S.
 Before LAY, Chief Judge, TIMBERS,* Senior Circuit Judge, and FAGG, Circuit Judge.
 FAGG, Circuit Judge.
 
 
 1
 Defendants appeal their convictions arising out of a scheme to finance a real estate development by obtaining bank loans in violation of 18 U.S.C. Secs. 371, 656, 1005, and 1014. Defendant Saylor-Robinson also appeals separately from the district court's denial of her motion for new trial. We affirm.
 
 I.
 
 2
 Newton E. Copple was the key figure in a proposed real estate development in Lincoln, Nebraska. In 1979 Copple had reached his personal loan limits. In order to acquire the money necessary to continue the real estate project, Copple needed to obtain loans without appearing to be the borrower. In exchange for an interest in the development, Copple secured the cooperation of James Gillette, a relative who was the primary owner and chief executive officer of two financial institutions in Beatrice, Nebraska. One of these institutions, then known as Beatrice State Bank (the Bank), was insured by the Federal Deposit Insurance Corporation (FDIC); the other, First Security Savings Company (the Savings), was not.
 
 
 3
 Gillette arranged for the Savings, and in one instance the Bank, to make loans for Copple's benefit in the names of other borrowers. Most of the loans were based on nothing more than unsecured promissory notes naming as debtors Copple corporations, Copple employees, or individuals acquainted with Copple. Some of these individuals were unaware they were named as debtors; others received a portion of the loan proceeds with the remainder going to Copple. A few loans were made on the apparent strength of corporate financial statements that greatly overstated corporate assets. No credit evaluations or formal loan applications were processed, and the tacit understanding was Copple, rather than the apparent debtors, would make repayment. Money for the development also was obtained when Gillette arranged for Copple to assign his seller's interest in sham real estate purchase agreements to the Savings in exchange for cash. Three of Copple's key administrative employees, Dana Saylor-Robinson, Susan K. Wilson, and Connie E. Kahle, aided the scheme by signing real estate purchase agreements, notes, extension notes, and corporate financial statements. These employees also verified financial statements, negotiated loan checks, and directed the loan funds to Copple bank accounts. Copple obtained approximately $500,000 using this scheme between late 1979 and early 1981.
 
 
 4
 The majority of loan proceeds were obtained from the Savings, but partly in an effort to keep the Savings within its own institutional lending limits, Gillette transferred many of the loans to the Bank utilizing a banking practice known as "participation." Participation occurs when a financial institution purchases all or part of a loan from the original lending institution. The purchasing institution obtains the right to collect a proportionate share of principal and interest due on the loan and bears a proportionate risk of loss in the event the loan is not repaid.
 
 
 5
 Because of concern by Gillette and state and federal banking authorities over the unpaid and unsecured status of these loans, Copple's father agreed in the latter part of 1981 to assume management as trustee of Copple's property and to attempt arrangements for repayment of the loans. As an interim measure, in November 1981 numerous outstanding Copple loans were consolidated into two equal short-term obligations at the Savings in the names of two Copple businesses, Jackson Development Company (Jackson) and Patterson Investment Company (Patterson). Neither company was then a viable business enterprise, and neither owned any significant assets. Each company signed notes undertaking the payment of the loans already made for Copple's benefit.
 
 
 6
 In January 1982 and again in April, the Jackson and Patterson notes remained unpaid, and their due dates were extended. In June 1982 both notes, to the extent of $150,000 each, were participated by the Savings to the Bank. Saylor-Robinson, Wilson, and Kahle were involved in the 1981 loan consolidations and the 1982 extensions and signed various documents for Jackson and Patterson. The Jackson and Patterson notes and their extensions were not entered on the books of the Savings or the Bank and were never paid, and the losses ultimately were absorbed by buyers of the financially troubled institutions.
 
 
 7
 Copple's scheme first came to the attention of the Federal Bureau of Investigation (FBI) in the fall of 1982 when the agency received a tip regarding possible sham loans in the Bank and the Savings. The FBI initiated its own investigation, but also suggested the FDIC and state banking authorities conduct simultaneous examinations of the Bank and Savings to prevent passing of questionable loans and notes between the two institutions. When the examinations turned up evidence of improper practices, the FBI subpoenaed state and federal banking authorities requesting their examination reports for use in this criminal prosecution.
 
 
 8
 Copple, Saylor-Robinson, Wilson, and Kahle were all convicted of conspiracy to defraud the United States in violation of section 371. Each was also convicted of aiding and abetting the violation of one or more of sections 656, 1005, and 1014. Saylor-Robinson was convicted for submitting a false corporate financial statement to the Bank in violation of section 1014 when she obtained a loan for Copple directly from the Bank. Gillette was treated as an unindicted coconspirator in exchange for his cooperation.
 
 II.
 
 9
 As an initial matter with regard to loans obtained from the Savings, defendants contend the government failed to prove their involvement in a federal crime. Defendants argue any actions they took were directed at the Savings, and because the Savings was not federally insured, the federal statutes identified in the indictment do not apply to their actions. Defendants contend the impact of the Copple loans on the Bank followed only from Gillette's later participation of those loans, a process of which the defendants were unaware and which occurred after their involvement in each transaction was complete. Thus, defendants rely on Terry v. United States, 131 F.2d 40, 45 (8th Cir.1942), and argue that acts not violative of a federal statute when committed cannot later acquire a federal connection through acts over which the defendants had no control.
 
 
 10
 Defendants miss the point in the significance they attach to loan participation in this case and ignore the character of the charges as set out in the indictment. Their specific knowledge of a particular banking practice is irrelevant to the threshold question of whether a federal offense has been stated. Gillette's position as chief executive officer of both the Savings and the Bank allowed him to manipulate the transactions of each simultaneously. Within this framework Gillette misapplied funds (section 656) when he transferred Bank funds to the Savings for participation of Jackson and Patterson notes that he knew were not likely to be repaid. Gillette also made false bank entries (section 1005) when he made misrepresentations on the participation certificates for certain Jackson and Patterson notes. Under sections 656 and 1005, federal jurisdiction for these offenses is conferred not by the loan participations, but by Gillette's undisputed status as an officer of an FDIC-insured institution.
 
 
 11
 Defendants have been charged with aiding and abetting and conspiring with Gillette, who as a bank officer held a position sufficient to trigger jurisdiction of the statutes specified in the indictment. These charges against the defendants, if proven by sufficient evidence according to conspiracy and aiding and abetting principles, state a federal offense. With regard to the section 1014 charge, federal jurisdiction cannot be in doubt because Saylor-Robinson obtained that loan directly from the Bank.
 
 III.
 
 12
 Defendants' central contention in this appeal is whether their status as conspirators and aiders and abettors is established beyond a reasonable doubt by sufficient evidence. When reviewing a challenge to a jury verdict for insufficiency of the evidence, we view all evidence and the reasonable inferences drawn from it in the light most favorable to the verdict. United States v. Robinson, 782 F.2d 128, 129-30 (8th Cir.1986). "[T]he evidence must simply be sufficient to convince the jury beyond a reasonable doubt that the defendant[s] [are] guilty," and circumstantial as well as direct evidence may support a conviction. United States v. Coronel-Quintana, 752 F.2d 1284, 1292 (8th Cir.) (citations omitted), cert. denied, 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985).
 
 
 13
 "To convict a defendant of criminal conspiracy, the government is obligated to prove that 'the individual entered an agreement with at least one other person, that the agreement had as its objective a violation of the law, and that one of those in agreement committed an act in furtherance of the objective.' " United States v. Michaels, 726 F.2d 1307, 1310-11 (8th Cir.) (quoting United States v. Evans, 697 F.2d 240, 244-45 (8th Cir.), cert. denied, 460 U.S. 1086, 103 S.Ct. 1779, 76 L.Ed.2d 350 (1983)), cert. denied, 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984); see also United States v. Mims, 812 F.2d 1068, 1074 (8th Cir.1987). A defendant need not know all the conspirators or all the details of their activities. Mims, 812 F.2d at 1074-75. Once a conspiracy is established, " 'even slight evidence connecting a particular defendant to the conspiracy may be substantial and therefore sufficient proof of the defendant's involvement in the scheme.' " Michaels, 726 F.2d at 1311 (citations omitted); see also Mims, 812 F.2d at 1075. It must, however, be shown the defendants knowingly contributed their efforts to the objective. United States v. Jones, 545 F.2d 1112, 1115 (8th Cir.1976), cert. denied, 97 S.Ct. 814, 429 U.S. 1075, 50 L.Ed.2d 793 (1977).
 
 
 14
 To convict defendants of aiding and abetting, the government had to prove the defendants associated themselves with the illegal activity, they took part in the activity as something they wished to bring about, and by taking part they sought to make the activity succeed. Robinson, 782 F.2d at 130. Defendants need not have knowledge of the particular means used by the principal to commit the crime if they "actively and intentionally participated in the earlier steps of the transaction." United States v. Beck, 615 F.2d 441, 453 (7th Cir.1980); see also United States v. Austin, 585 F.2d 1271, 1277 (5th Cir.1978).
 
 
 15
 Defendants' scattered challenges to the sufficiency of the evidence include the argument Copple had no intent to harm the Bank because he intended to repay the loans; and Copple's administrative employees argue they were only responding to the directives of their employer. The defendants also claim no false bank entries were made because Gillette withheld the false documents, and that there is no evidence the Bank was influenced in its loan participations by any materially false statements of the defendants. An additional argument is made the instruments signed by the defendants in January 1982 were not participated to the Bank as charged in the indictment. We reject each of these contentions.
 
 
 16
 Intent to repay the loans is not a defense to a section 656 or 1005 violation, Austin, 585 F.2d at 1277, and the jury rejected Copple's employees' argument their actions were merely a response to the commands of their employer. Defendants also overlook the fact that an omission where an honest entry would otherwise be made can be a false entry for section 1005 purposes. United States v. Dougherty, 763 F.2d 970, 973 (8th Cir.1985). Similarly, proof the Bank was influenced by or actually relied on the false statement is not necessary for a section 1014 violation. United States v. Davis, 752 F.2d 963, 969 (5th Cir.1985). Finally, the record does not support the argument that the instruments signed by defendants in January 1982 were not participated to the Bank.
 
 
 17
 The evidence at trial established Gillette and Copple devised a scheme to finance their real estate project by circumventing lending limits. Their task was to obtain money for Copple under circumstances in which he would not otherwise be entitled to it, without any particular regard to the source of the funds. This scheme required loan documents and accounting entries periodically to be falsified as to the actual debtor's name and ability to repay the loan. Thus, the misapplication of funds and the making of false bank entries were inevitable and natural consequences of the scheme. See Austin, 585 F.2d at 1277-78. Saylor-Robinson, Wilson, and Kahle supported the scheme by helping to fabricate its documentary foundation and by routing to Copple the funds obtained. We hold the record contains evidence sufficient to permit the jury to convict defendants for all offenses with which they are charged.
 
 IV.
 
 18
 Copple, Saylor-Robinson, and Kahle also challenge their section 656, 1005, and 1014 convictions on the basis of a variance between the grand jury indictment and the indictment as submitted to the jury at trial. At the close of the government's case the district court deleted from the indictment as surplusage language that would have made the defendants liable as principals for all of the substantive offenses of their coconspirators. See Pinkerton v. United States, 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946); United States v. DeLuna, 763 F.2d 897, 918 (8th Cir.), cert. denied, 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed. 336 (1985). Defendants claim this change modified the charges against them and prejudiced their defense in violation of the fifth amendment. We disagree.
 
 
 19
 Not all changes in the language of indictments implicate constitutional concerns. When the indictment fully notifies the defendant of the charges to be met at trial and an amendment results only in a narrowing of criminal liability, the variance is not a fifth amendment violation. See United States v. Miller, 471 U.S. 130, 144-45, 105 S.Ct. 1811, 1820, 85 L.Ed.2d 99 (1985). Here the original indictment provided adequate notice of the offenses to be met at trial because it charged the defendants with the conspiracy and aiding and abetting violations for which they were ultimately convicted. The district court's elimination of the Pinkerton charges simply decreased the number of theories of criminal liability available to the government on the substantive counts. Under Miller, this narrowing of each defendant's potential criminal responsibility is not a variance that violates the fifth amendment.
 
 V.
 
 20
 The defendants also assert two other grounds for reversal stemming from changes made in the indictment after the government's evidence had been presented to the jury. First, defendants claim to have been prejudiced because the jury was not specifically advised of the district court's determination the conspiracy ended on a date (November 1, 1981) earlier than the date contained in the original indictment read to the jury at the beginning of the trial (May 31, 1984). Second, the defendants argue this change in the duration of the conspiracy resulted in the jury improperly being permitted to consider prejudicial hearsay evidence the court had already received in reliance on conspiracy principles.
 
 
 21
 After the district court narrowed the duration of the conspiracy, the indictment was modified. The jury was given the modified version of the indictment for use during its deliberations and was instructed to refer to it. This copy of the indictment correctly stated the shortened length of the conspiracy, and the jury was instructed that only acts and statements occurring during the course and in furtherance of the conspiracy could be considered against all defendants on the conspiracy charge. Under these circumstances, we do not believe the district court committed reversible error when it failed to instruct specifically on the change in the conspiracy's duration.
 
 
 22
 Defendants also contend their convictions must be reversed because the jury was allowed to consider evidence received under a theory of admissibility no longer pertaining to that evidence after the length of the conspiracy was shortened. Defendants argue this state of the record mandates reversal because the ruling on the conspiracy's length undercut the original basis for the statements' admissibility, prevented the defendants from adequately preserving objections, and changed the number of offenses for which the evidence could be considered by the jury. The defendants object primarily to the admission of the testimony of FBI Agent Campbell. Campbell recounted the substance of interviews he conducted with the defendants during his case investigation. During the interviews the defendants admitted signing certain documents with knowledge of their inaccurate contents and participating in the loan consolidation meetings. They also admitted acting with knowledge their actions were being taken for Copple's benefit. All of these interviews took place after November 1981.
 
 
 23
 We need not evaluate the basis for the district court's ruling on the admissibility of the challenged statements in the circumstances of this case. "[I]f the grounds given by the district court for admissibility of the evidence are incorrect, the court's ruling will be reversed only if there are no grounds under which the evidence could properly have been admitted." United States v. Ray, 768 F.2d 991, 994 (8th Cir.1985).
 
 
 24
 After reviewing the record, we conclude the defendants' statements about which Campbell and others testified were independently admissible as admissions of parties. Fed.R.Evid. 801(d)(2)(A). As admissions, the statements were admissible without regard to when they were made in relation to the duration of the conspiracy. See United States v. DeLuna, 763 F.2d 897, 917 (8th Cir.), cert. denied, 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985); United States v. Smith, 600 F.2d 149, 152 (8th Cir.1979). Nor was the jury left in doubt concerning its consideration of the statements. Before Campbell testified and again in the final instructions, the jury was cautioned it was not permitted to consider these statements against all defendants, but only against the defendant who made the statement. Thus, the district court's mistaken reliance on an inappropriate theory of admissibility is harmless error. See Fed.R.Crim.P. 52(e); Metallurgical Indus., Inc. v. Fourtek, Inc., 790 F.2d 1195, 1207 (5th Cir.1986).
 
 
 25
 Finally, contrary to defendants' contention, the postconspiracy evidence, once properly admitted, may be considered by the jury against individual defendants on both the aiding and abetting and conspiracy charges. See Lutwak v. United States, 344 U.S. 604, 618, 73 S.Ct. 481, 489, 97 L.Ed. 593 (1953); DeLuna, 763 F.2d at 917; Smith, 600 F.2d at 152 & n. 2.
 
 VI.
 
 26
 Copple, Saylor-Robinson, and Kahle argue much of the documentary evidence against them should have been excluded because it was obtained by FDIC and state banking authorities acting solely as information-gathering agencies for the FBI. See United States v. LaSalle Nat'l Bank, 437 U.S. 298, 317, 98 S.Ct. 2357, 2368, 57 L.Ed.2d 221 (1978). These defendants argue the agencies were acting in bad faith when they conducted examinations of the records of the Bank and the Savings because those examinations were used solely to uncover evidence for these criminal prosecutions.
 
 
 27
 An administrative agency investigation is not improper merely because it seeks evidence that by its nature could be relevant to a civil as well as to a potential criminal proceeding. See Donaldson v. United States, 400 U.S. 517, 532-33, 91 S.Ct. 534, 543, 27 L.Ed.2d 580 (1971); United States v. Giordano, 419 F.2d 564, 568 (8th Cir.1969), cert. denied, 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970). Bank examinations like those conducted in this case are routinely within the jurisdiction and affirmative duties of the agencies assigned to perform them. On the basis of information made available by the FBI, these agencies were entitled to investigate potential misconduct within their areas of responsibility. Indeed, at least one purpose of the challenged examination by state banking authorities here was to follow up on regulatory violations found approximately three months earlier. We conclude Copple, Saylor-Robinson, and Kahle have shown no valid basis for exclusion of the documentary evidence.
 
 VII.
 
 28
 All defendants perceive misconduct by the prosecutor, attacking particularly his statement in closing argument that Copple's father had pleaded guilty or been found guilty on bank fraud charges arising from his role in the consolidation of Copple's loans. Our review of the transcript shows the events surrounding Copple's father's cooperation were brought out in his direct testimony and were part of the evidence before the jury with regard to his credibility as a witness. Under these circumstances, the prosecutor's remark in closing argument was not improper.
 
 
 29
 Copple, Saylor-Robinson, and Kahle also claim the prosecutor improperly intimidated several witnesses in order to coerce their testimony for the government. They claim these witnesses were threatened with contempt sanctions, criminal prosecution, and deportation and were coached by the government on the way in which their testimony should be presented. Apart from this claim the defendants assert no other grounds for reversal based on the testimony given by these witnesses. Thus, unless the defendants were prejudiced by the means they contend the government used to coerce the witnesses to testify, they are not entitled to relief from their convictions.
 
 
 30
 The defendants make no claim the witnesses were coerced not to tell the truth or testified untruthfully, or were prevented from testifying for the defense. Each defendant had the opportunity for full cross-examination of these witnesses during which the coercive circumstances were fully explored, and these circumstances were argued to the jury. In sum, the claimed coercion had no effect on the testimony given by the witnesses at trial or their availability to the defense, and the jury was fully informed; hence, Copple, Saylor-Robinson, and Kahle were not prejudiced by the government's treatment of its witnesses.
 
 VIII.
 
 31
 Copple contends he received ineffective assistance of counsel because his court-appointed attorney did not have adequate time to prepare for trial. Copple's original defense counsel withdrew, and Copple insisted on proceeding pro se. Despite Copple's insistence that he represent himself, approximately two months before trial the district court appointed standby counsel to assist Copple. About three weeks before trial the district court informed the standby counsel he should be prepared to conduct Copple's defense at trial. A motion for continuance was denied.
 
 
 32
 Any uncertainty as to the status of standby counsel was the product of Copple's protracted refusal either unequivocally to waive his right to counsel or to accept the attorney's appointment. In addition, the transcript shows Copple's attorney was in fact prepared and vigorously participated on behalf of Copple before and during the trial. The district court was particularly sensitive to the issue of Copple's legal representation and made every effort to provide Copple at all times with adequate counsel. Under these circumstances, we cannot conclude Copple was denied effective assistance of counsel.
 
 IX.
 
 33
 Finally, various of the defendants put forth miscellaneous attacks on their convictions. Among these challenges are: (1) bad faith by the prosecutor in response to defendants' requests for grand jury materials under the Jencks Act, see 18 U.S.C. Sec. 3500; (2) improper remarks by the prosecutor in closing argument concerning his personal belief of the defendants' guilt and the defendants' failure to produce evidence; and (3) denial of a fair trial by virtue of certain courtroom and trial procedures required by the district court. The legal principles that apply to these arguments are well established and need not be restated here. We find no basis in the record for reversal on any of these grounds.
 
 X.
 
 34
 In a separate appeal Saylor-Robinson challenges the district court's denial of her motion for new trial based on newly discovered evidence. Saylor-Robinson claims she is entitled to a new trial because FBI Agent Campbell gave false testimony and the government suborned his perjury; because Copple testified she signed a false financial statement; and because the government withheld evidence favorable to Saylor-Robinson's defense.
 
 
 35
 Saylor-Robinson argues with regard to the perjury evidence that the district court used the wrong standard in reviewing her motion. She contends the general standards for newly discovered evidence, see, e.g., United States v. Massa, 804 F.2d 1020, 1022 (8th Cir.1986), do not apply in the case of perjury by a trial witness. The Supreme Court has held in United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976), that "a conviction obtained by the knowing use of perjured testimony * * * must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." The district court, however, found no perjury in the testimony of Agent Campbell, and thus there is no basis for Saylor-Robinson's argument the district court applied an improper standard.
 
 
 36
 Saylor-Robinson claims she was surprised by Copple's testimony that Saylor-Robinson signed a false financial statement. We agree with the district court that this testimony is not newly discovered, but rather a matter particularly within Saylor-Robinson's knowledge. Copple was available for cross-examination at trial, and Saylor-Robinson had ample opportunity for impeachment of his testimony.
 
 
 37
 Saylor-Robinson also argues she is entitled to a new trial because the government withheld two reports of FDIC examinations of the Bank. The government's "failure * * * to disclose upon request evidence favorable to the defense violates due process if the evidence was material to guilt." Daniels v. Wood, 819 F.2d 195, 198 (8th Cir.1987) (citing Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963)). The district court found, however, that Saylor-Robinson had adequate access to the information in the reports. The trial transcript shows a government witness was cross-examined by Saylor-Robinson's counsel about the examinations, and at least one of the reports was available at trial. Finally, even if Saylor-Robinson had been denied access to the documents or the person who prepared them, the evidence was not material for Brady purposes because we do not believe there is a reasonable probability access to the reports would have brought about a different result. See id. (citing United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985)). We find no abuse of discretion in the district court's decision on the motion for new trial. See United States v. Widgery, 674 F.2d 710, 713 (8th Cir.), cert. denied, 459 U.S. 894, 103 S.Ct. 192, 74 L.Ed.2d 155 (1982).
 
 
 38
 We have carefully reviewed the record, briefs, and the arguments of each of the parties. Finding no reversible error, we affirm each of the convictions.
 
 
 
 *
 The HONORABLE WILLIAM H. TIMBERS, Senior United States Circuit Judge for the Second Circuit, sitting by designation