UNITED STATES of America,
Plaintiff-Appellee,

v.

John P. COWART, Defendant-Appellant.

No. 78–5175.

United States Court of Appeals,
Fifth Circuit.

May 22, 1979.

L. Paul Cobb, Jr., Atlanta, Ga., for defendant-appellant.

William L. Harper, U. S. Atty., Gale McKenzie, Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before GOLDBERG, SIMPSON and CLARK, Circuit Judges.

SIMPSON, Circuit Judge:

This appeal follows a bench trial, at which John P. Cowart was found guilty under all thirteen counts of an indictment. Counts 1 through 12 charged aiding and abetting the commission of wire fraud, in violation of 18 U.S.C. §§ 2 and 1343 (1976), and Count 13 charged conspiring to commit wire fraud, in violation of 18 U.S.C. §§ 371 (1976) and 1343 (1976). Appellant was adjudged guilty and sentenced to eighteen months confinement on each of the twelve substantive counts, to be served concurrently. He was given a three year confinement sentence under Count 13 for conspiracy, to be served consecutively to the substantive counts, but with its execution suspended, subject to probation for five years.

Cowart's appeal raises two points. First, he asserts that the United States Constitution's Fifth Amendment double jeopardy clause was violated when the trial court convicted and sentenced him for conspiring to commit wire fraud as well as aiding and abetting the commission of the same wire fraud. His second contention is that the trial evidence in support of the twelve substantive counts, or either of them, was insufficient for conviction. We find no merit in either point and affirm.

## I. FACTS

Appellant was the co-owner with Joseph Emory Suggs [1] of Cowart and Suggs Realty Company, Incorporated ("C & S Realty"), a real estate brokerage firm located in Cobb County, Georgia. This firm was engaged in the sale of houses constructed by Cowart and Suggs Builders, Incorporated, also co-owned by the appellant and Suggs, as well as others. Financing for the sale of these houses was obtained through Charter Mortgage Company ("Charter").

Charter, during 1972 and 1973, was a multi-state mortgage company with its home office in Jacksonville, Florida. Its business included the origination, the purchase and sale of conventional mortgage loans. In extending financing, Charter would lend no more than ninety-five percent of the purchase price, and only to qualified borrowers with the required minimum five percent down payment. *Charter never offered one hundred percent financing.*[2]

Jessie Madden,[3] a loan officer employed by Charter in its Atlanta, Georgia branch office, was the Charter representative with whom C & S Realty dealt on all its sales. Madden's responsibilities as a loan officer including soliciting residential loans, accepting loan applications, ascertaining that the applications were properly documented, and submitting applications to Charter's Jacksonville home office for analysis and approval. Madden did not have authority to approve loan applications.

Properly documented loan packages, submitted to Charter's Jacksonville office, were analyzed by home office underwriters. These individuals analyzed the credit wor-

---

**1.** Suggs was a co-defendant in this case, having been indicted along with Defendant Cowart and Jessie Madden on June 15, 1977. Prior to trial, on September 23, 1977, Suggs died. Madden entered a plea of guilty on two counts charging aiding and abetting the commission of wire fraud, and is not a party to this appeal. *See* note 3 *infra.*

**2.** There were several reasons offered to explain why a minimum five percent down payment was required for the extension of a mortgage loan. First, a substantial cash investment in the property provided the borrower with an incentive to maintain the property and debt service on the loan during "hard times". Without this investment, Charter feared borrowers might abandon their property, leaving Charter with the unpaid indebtedness. Second, Charter

could not sell any of the loans it originated on the secondary mortgage market unless cash down payments had been made by the borrowers. Finally, Charter could not obtain mortgage insurance unless a down payment had been made in fact.

**3.** Madden, as stated in note 1 *supra*, was a co-defendant in this case. On July 25, 1977, he entered a plea of guilty to counts 5 and 6 of the indictment. On October 7, 1977, he was sentenced to eighteen months confinement on count 5. With respect to count 6, the court suspended a three year term of imprisonment consecutive to that imposed under count 5, and placed Madden on probation for five years, with the probation to commence after Madden completed the sentence under count 5.

thiness of the prospective borrower and the value and quality of the property the applicant wished to purchase with the proceeds of the subject loan. In deciding whether to approve the loan, Charter relied upon various documents contained in the loan package: the loan application completed by the prospective borrower, the sales contract prepared by the real estate broker, a verification of deposit, a verification of employment, property appraisals, and a credit report prepared by an independent credit agency. Approval of loan applications was communicated to the Atlanta branch office from Jacksonville by telephone and/or telecopier.

Cowart admits that "[s]ome where between 1971 and 1973, [he] and Suggs formulated an idea to permit 100% financing on the homes they were selling based on rebate gimmicks utilized in other industries". Brief for Appellant at 7. Cowart implemented this "idea" by placing the following advertisement in a local newspaper:

### AN OFFER YOU CAN'T REFUSE

We will put you in the home of your choise [sic] regardless of past credit problems or present cash problems, because we have the best financing plan in town.

### "UP TO 100 PERCENT FINANCING"

We have a wide selection of quality homes from which to choose in Douglas, Cobb & Paulding County, Priced from the low $20's to high $30's. Call one of our courteous agents today and see for yourself why we have AN OFFER YOU CAN'T REFUSE.

### COWART–SUGGS REALTY

#### 942–0028

| | |
|---|---|
| MIKE GRAY | 942–0028 |
| STEVE CORDER | 942–1832 |
| ANN BOONE | 943–3808 |
| DIANE HORNSBY | 942–7683 |

Government Exhibit 28.

The evidence adduced at trial indicated that the procedures devised by Madden, Suggs, and Defendant Cowart to offer prospective purchasers "up to 100% financing" "regardless of past credit problems or present cash problems" included: preparing credit reports without required "legals", soliciting inaccurate verifications of employment, furnishing fictitious credit references, and procuring misleading and fraudulent verifications of deposit.

Rachael Coffee, an employee of Retailers Commercial Agency in 1972 and 1973, testified about preparation of credit reports in Charter's loan packages. She testified that Retailers, retained by Madden as an independent credit agency to prepare credit reports on prospective borrowers, was *not* requested to perform "legal checks" on loan applicants. Specifically, question 19, which appears on each and every credit report, reads, "Did you learn of any failures, bankruptcies, mortgage foreclosures, suits, judgments, or garnishments? If so, state when?" In every instance the response to this question was "No." However, "legals" were not performed by Retailers unless requested, and Madden did not request them.

Sherry Condit, employed in 1972 and 1973 by Charter's Atlanta office as a loan processor, testified that Madden instructed her to order credit reports without "legals". Under Charter's underwriting guidelines, however, investigative credit reports were required to contain "legals". Moreover, if credit reports accidentally showed "legals", Condit explained, Madden would order another credit report through a different credit agency. Condit also testified with respect to verifications of employment and credit references.

Verifications of employment ("VOE") forms request, *inter alia*, information regarding the salary earned by the loan applicant. Condit testified that when an applicant's VOE showed a salary insufficient to qualify for a mortgage loan, Madden would instruct her to contact Cowart and inform him that the applicant was "low on salary". Cowart's response, as testified to by Condit, was, "Send it to me; I'll take care of it". Eventually, Condit would receive a VOE with a qualifying salary. Mike Gray, a

salesperson for C & S Realty in 1972, testified that when applicants needed additional salary to qualify, C & S Realty agents would suggest to these applicants that they speak with their employers and ask these employers to verify that they earned a higher salary than was actually the case.

Condit also testified that Madden instructed her to notify Cowart when an applicant had not listed a sufficient number of credit references to qualify for a mortgage. Cowart's response, Condit testified, was, "We'll get something". Thereafter, Condit would receive sufficient credit references for that particular applicant. Gray and Steve Corder, another C & S salesperson, confirmed that Cowart supplied fictional credit references for loan applicants.

The centerpiece of Cowart's one hundred percent financing "idea" involved the verifications of deposit required by Charter. A verification of deposit ("VOD") is a request from a lender to the loan applicant's bank seeking verification of the amount of funds held by the bank in the applicant's account. Charter, as a prudent lender, required prospective borrowers to have sufficient funds to make the required down payment on the house, with enough remaining to pay the closing costs and anticipated moving expenses.

Gray and Corder testified that Cowart personally explained to them how a loan applicant's VOD should be handled when, in fact, the prospective borrower did not have the required down payment. Cowart instructed his salespeople to have the purchaser issue a personal check, payable to Cowart & Suggs Builders or whomever the other vendor was, in the required amount. If the purchaser did not have a checking account, he was instructed to open one with five or ten dollars. In every transaction forming the basis for each of the twelve substantive counts in the indictment, the purchaser did not have sufficient funds to cover the personal check issued. Nevertheless, in every[4] transaction the purchaser's personal check was endorsed by Cowart, presented to a bank where Cowart did business,[5] and exchanged for a cashier's check. The cashier's check would be made payable to the same individual purchaser who drew the personal check, would be in an amount equal to that of the personal check, and would bear the caption "refund down payment". This cashier's check would then be taken to the purchaser's bank and deposited into his account. At the same time the deposit was made, Cowart, or one of his salespeople, would obtain a VOD from the purchaser's bank: based upon the temporarily inflated balance produced by the cashier's check, the bank would verify that the prospective borrower had sufficient funds. Subsequently, the personal check and cashier's check deposited would cancel each other out. No bona fide down payment was made in any of the transactions forming the basis for Counts 1 through 12 of the indictment. In each instance, Cowart's VOD procedure was utilized.

Corder and Gray testified that VOD forms were either hand-delivered or mailed to C & S Realty's office by Madden despite the fact that realtors were not to possess these forms.

---

4. The Charter loan packages regarding Counts 1 through 7 and 9 through 12, admitted into evidence as Exhibits 1, 2, 3a, 3b, 4, 5, 6, 7, 9, 10, 11, and 12, contain personal checks drawn by purchasers and bearing the endorsement of John P. Cowart. With regard to Count 8, the Charter loan package does not contain a check endorsed by Cowart; however, the bank records contained therein clearly show that the VOD scheme devised by Cowart was employed in obtaining a VOD for purchaser/loan applicant Miller.

5. Elaine Boyd, an employee of Cobb County Bank, testified that her responsibilities as a loan teller included issuance of cashier's checks. She testified that she issued several cashier's checks to Cowart. In each instance, appellant obtained the cashier's check in exchange for a personal check of another person (not Cowart), drawn on another bank, and made payable to Cowart and Suggs Builders. Boyd did not check with the drawee bank to determine whether the drawer had sufficient funds to cover the check. Boyd testified that she did not do so because Cowart was a good customer of Cobb County Bank and would have stood behind the checks if returned for insufficient funds.

Finally, Cowart certified, at various real estate transaction closings forming the basis for different counts of the indictment, that the down payment was bona fide and had been or would be received no later than closing.[6]

Charter, which lost approximately $100,000 from those transactions listed in Counts 1 through 12 of the indictment, would not have approved any of those loans had it known of the VOD procedure employed by C & S Realty salespeople under Cowart's tutelage. Employees of two mortgage companies, Empire Home Loans and Affiliated Mortgage Investments, testified that they would not have purchased any loan packages for their firms from Charter had they known of the VOD scheme. An employee of Mortgage Guaranty Insurance Company testified that his firm would not have insured Charter's loans had it been aware of the VOD scheme.

## II. DOUBLE JEOPARDY

■ On this appeal Defendant Cowart seeks to invoke one of the three related protections afforded under the Fifth Amendment's double jeopardy clause, that of prohibiting multiple punishment for the same offense.[7] Defendant's position is that

---

**6.** With respect to Counts 1, 3, 5, 6, 10, 11, and 12, Cowart signed a "Statement of Closing" which reflected a down payment made by the purchaser in an amount equal to five percent of the purchase price. This document contained the following paragraph:

> The above statement has been examined and approved. Each of us acknowledge the correctness of the same and authorizes disbursements to be made as listed. Receipt is acknowledged of amounts shown due each of us.
>
> \* \* \* \* \* \*
>
> The above is a complete, true and correct account of the funds received and disbursed by me in connection with subject loan . ..

With respect to Counts 1, 3, 5, and 11, Cowart executed an affidavit form of Federal National Mortgage Association, a mortgage insurer, which listed the cash equity of the purchaser in amounts equalling five percent of the purchase price. This affidavit contained the following statement:

> By signing this affidavit, Property Vendor certifies, for reliance thereon by Lender and Mortgage Insurer, if any, that the Total Purchase Price stated above represents the true and complete transaction between Purchaser and Vendor for the property described above.

With respect to Counts 1, 3, 5, and 11, Cowart executed a Purchase affidavit to Charter which certified that the purchaser had paid an amount in cash equal to approximately five percent of the purchase price. This affidavit, signed by Cowart, contained the following statement:

> The purchase price and down payment represented are true and bona fide, and the cash portion of the down payment will be paid by the buyer, no later than the Real Estate Closing.

With respect to Counts 1, 3, 5, 6, 10, 11, and 12, Cowart signed and executed an affidavit for Mortgage Guaranty Insurance Corporation and Charter. Cowart certified in this affidavit that:

> (2) The down payment represented above [five percent of the purchase price] is true and bona fide.
> (3) The cash portion of the down payment was actually paid, or will be paid no later than the real estate closing, by the purchaser(s) and received by the vendor(s).

This affidavit also contained the following statements:

> The undersigned hereby acknowledges that this affidavit is being made for the purpose of inducing a Federal Savings and Loan Association to make or purchase the loan herein applied for, and that the provisions of Section 1014 of Title 18, United States Code, which provide in part: "Whoever knowingly makes any false statement or report for the purpose of influencing in any way the action . . . of a Federal Savings and Loan Association . . . upon any application . . . shall be fined not more than $5,000 or imprisoned not more than two years or both." are applicable to this transaction.
>
> The undersigned hereby further acknowledges that the lender who originated this loan relied, and any lender who shall purchase it will rely, upon the allegations set forth by the undersigned and that Mortgage Guaranty Insurance Corporation has relied upon said allegations in insuring this loan.

Kenneth L. Chalker, an attorney who closed many of the loans which are the subject of the indictment in this case, testified that at every closing he would go over, in detail, with Cowart the forms and affidavits quoted above in which Cowart certified that down payments had been made in fact.

**7.** The double jeopardy clause provides three related protections: protection against a second prosecution for the same offense after acquittal; protection against a second prosecution for the same offense after conviction; and protection against multiple punishments for the same offense. *Brown v. Ohio*, 432 U.S. 161,

the trial court violated the Fifth Amendment's command that "no person be subjected for the same offense to be twice put in jeopardy of life or limb" when it convicted and sentenced him for conspiring to commit wire fraud and for aiding and abetting the commission of wire fraud. Our disposition of this claim requires consideration of one question: whether under the facts of this case conspiring to commit wire fraud and aiding and abetting the commission of wire fraud are the "same offense".

■ To determine whether defendant was subject to multiple punishment for the same offense, we look to the leading case of *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), where the Supreme Court of the United States formulated the applicable standard.

The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test of be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.

284 U.S. at 304, 52 S.Ct. at 182. *See also Brown v. Ohio,* 432 U.S. 161, 166, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977); *Jeffers v. United States,* 432 U.S. 137, 151, 97 S.Ct. 2207, 2216, 53 L.Ed.2d 168 (1977).

This standard frequently has been referred to as the "same evidence" test;[8] however, the *Blockburger* test looks *not* to the evidence adduced at trial but focuses on the elements of the offense charged. *Brown v. Ohio,* 432 U.S. at 166, 97 S.Ct. at 2225 (*Blockburger* test emphasizes the elements of the two crimes); *Iannelli v. United States,* 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1294, 43 L.Ed.2d 616 (1975) ("If each [offense] requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes."); *United States v. Dunbar,* 591 F.2d 1190, 1193 (5th Cir. 1979) ("Application of the [*Blockburger*] test focuses on the

---

165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977); *United States v. Dunbar,* 591 F.2d 1190, 1192 (5th Cir. 1979); *United States v. Smith,* 574 F.2d 308, 309 (5th Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 321, 58 L.Ed.2d 325 (1978).

**8.** The "same evidence" test derives its origins from two Supreme Court cases predating *Blockburger. Morgan v. Devine,* 237 U.S. 632, 35 S.Ct. 712, 59 L.Ed. 1153 (1915); *Gavieres v. United States,* 220 U.S. 338, 31 S.Ct. 421, 55 L.Ed. 489 (1911).

In *Morgan,* the Court reversed the lower court's grant of a writ of habeas corpus. Defendants had pled guilty to one count of burglarizing a United States Post Office and one count charging larceny of property belonging to the United States Post Office. Defendants had sought habeas relief on the ground that they had been denied their Fifth Amendment protection against double jeopardy because several acts charged in the two counts were done at the same time and as part of the same transaction. After showing the crimes of burglary and larceny were separate offenses, each of which could be punished separately, the Court said:

As to the contention of double jeopardy upon which the petition of habeas corpus is rested in this case, this court has settled that the test of identity of offenses is *whether the same evidence is required to sustain them*; if not, then the fact that both charges relate to and grow out of one transaction does not

make a single offense where two are defined by the statutes.

237 U.S. at 641, 35 S.Ct. at 715 (emphasis added).

In an earlier case, *Gavieres v. United States,* 220 U.S. 338, 31 S.Ct. 421, 55 L.Ed. 489 (1911), the Court affirmed the defendant's conviction for insulating a public officer by deed or word in his presence even though defendant previously had been convicted of behaving in an indecent manner in a public place. The acts and words of the defendant set forth in both prosecutions were the same. The two offenses were found to be separate and not the same.

A conviction or acquittal upon one indictment is no bar to a subsequent conviction and sentence upon another, unless the evidence required to support a conviction upon one of them would have been sufficient to warrant a conviction upon the other. The test is not whether the defendant has already been tried for the same act, but whether he has been put in jeopardy for the same offense. A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.

220 U.S. at 342, 31 S.Ct. at 422 (emphasis added).

statutory elements of the offenses charged."). An examination of the elements of the respective offenses of "conspiracy" and "aiding and abetting" demonstrates that Cowart was convicted of two, separate and distinguishable offenses.

■ The crime of conspiracy, as proscribed by 18 U.S.C. § 371 (1976), deals with a specific type of socially reprehensible conduct: collective criminal agreement.[9] The proposition that the commission of a substantive offense and the conspiracy to commit it are separate and distinct offenses stems from the unique dangers posed by the crime of conspiracy.

> [C]ollective criminal agreement—partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality. Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish. Nor is the danger of a conspiratorial group limited to the particular end toward which it has embarked. Combination in crime makes more likely the commission of crimes unrelated to the original purpose for which the group was formed. In sum, the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise.

*Callanan v. United States,* 364 U.S. 587, 593–94, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961) (footnote omitted), *quoted in Iannelli v. United States,* 420 U.S. 770, 778, 95 S.Ct. 1284, 1290, 43 L.Ed.2d 616 (1975). Accordingly, the essence of the crime of conspiracy, and the evil at which the crime is directed, is an agreement to commit an unlawful act. *Iannelli,* 420 U.S. at 777 & n. 10, 95 S.Ct. at 1289–90 & n. 10. It is the element of agreement which serves to distinguish conspiracy from aiding and abetting which, although often based upon agreement, does not require proof of that fact. *Id.; Pereira v. United States,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

In *Pereira* the Court, in affirming one defendant's conviction for conspiring to commit mail fraud and aiding and abetting the commission of mail fraud, rejected the double jeopardy plea. Petitioners had alleged that their conviction on both the substantive counts and a conspiracy to commit the crimes charged in the substantive counts constituted double jeopardy. The Court found that:

> *The essence of the conspiracy charge is an agreement* to use the mails to defraud and/or to transport in interstate commerce property known to have been obtained by fraud. * * * Brading's conviction does not turn on the agreement. Aiding, abetting, and counseling are not terms which presuppose the existence of an agreement. Those terms have a broader application, making the defendant a principal when he consciously shares in a criminal act, regardless of the existence of a conspiracy.

347 U.S. at 11, 74 S.Ct. at 364 (emphasis added). The Court held, therefore, that the offense of aiding and abetting the commission of mail fraud was a separate and distinct offense from conspiring to commit mail fraud because the latter required proof of an agreement to commit an offense against the United States whereas the former did not. *Id.*

---

**9.** Section 371 provides:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

> If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

18 U.S.C. § 371 (1976).

The crime of aiding and abetting,[10] in contrast, occurs where the defendant " 'in some sort associate[s] himself with the venture, . . . participate[s] in it as in something that he wishes to bring about, . . . [and] seek[s] by his action to make it succeed.' " *Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949), *quoting United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (Hand, J.). *Accord United States v. Longoria*, 569 F.2d 422, 425 (5th Cir. 1978); *United States v. Anthony*, 474 F.2d 770, 773 (5th Cir. 1973); *Moore v. United States*, 356 F.2d 39, 43 (5th Cir. 1966).

Many cases analyze the crime of aiding and abetting in terms of the existence of a "community of unlawful intent" between the aider and abettor and the principal. *See, e. g., United States v. Austin*, 585 F.2d 1271, 1277 (5th Cir. 1978); *United States v. James*, 528 F.2d 999, 1015 n. 22 (5th Cir. 1976), *cert. denied*, 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976); *United States v. Sellers*, 483 F.2d 37, 45 (5th Cir. 1973), *cert. denied*, 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974); *Russell v. United States*, 222 F.2d 197, 199 (5th Cir. 1955). The language "community of unlawful intent" found in these cases, however similar to the "agreement" upon which the crime of conspiracy is based, does not rise to the level of "agreement". These cases merely stand for the proposition that to prove defendant's association with the criminal venture, there must be evidence that he engaged in some affirmative conduct designed to aid in the success of the venture *with knowledge that his actions would assist the perpetrator*, the principal of the crime. *Cf. United States v. Williams*, 341 U.S. 58, 64 & n. 4, 71 S.Ct. 595, 599 & n. 4, 95 L.Ed. 747 (1951) (aiding and abetting means to assist the perpetrator of the crime; to be present at a crime is not evidence of guilt as an aider and abettor); *Pereira v. United States*, 347 U.S. 1, 11, 74 S.Ct. 358, 364, 98 L.Ed. 435 (1954) (aiding and abetting are terms making the defendant a principal when he *consciously* shares in a criminal act, regardless of the existence of a conspiracy); *United States v. Longoria*, 569 F.2d 422, 425 (5th Cir. 1978) (to prove association, there must be evidence to establish that the defendant shared in the criminal intent of the principal; to prove participation, there must be evidence to establish that the defendant engaged in some overt act designed to aid in the success of the venture).

As a general proposition, therefore, conviction and punishment for the crime of conspiracy as well as the offense of aiding and abetting does not violate the Fifth Amendment double jeopardy clause because the offenses are separate and distinct. Co-

---

**10.** Aiding and abetting the commission of an offense against the United States is proscribed by 18 U.S.C. § 2 (1976) which provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

This provision does not define a crime but merely makes punishable as a principal one who aids or abets another in the commission of a substantive offense. *Powers v. United States*, 470 F.2d 991 (5th Cir. 1972). There can be no violation of section 2 alone; an indictment under this section must be accompanied by an indictment for a substantive offense. *United States v. Campbell*, 426 F.2d 547, 553 (2d Cir. 1970). Cowart was indicted for aiding and abetting the commission of wire fraud, as prohibited by 18 U.S.C. § 1343 (1976), which provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communications in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

To prove wire fraud the government must show a scheme, use of interstate communications, such as a telephone, and criminal intent to defraud. *United States v. Bradford*, 571 F.2d 1351, 1352 (5th Cir.), *cert. denied*, 437 U.S. 908, 98 S.Ct. 3100, 57 L.Ed.2d 1140 (1978); *United States v. Jackson*, 451 F.2d 281, 283 (5th Cir. 1971), *cert. denied*, 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972). Charter's approval of loan applications via telephone and/or telecopier from its Jacksonville, Florida office to its branch office in Atlanta, Georgia forms the basis of the interstate communication element of the offense.

wart asserts that his right against double jeopardy was violated in the case sub judice because: (a) proof of the conspiracy and aiding and abetting counts was offered indiscriminately;[11] (b) each and every scintilla of evidence offered by the government at trial could have been and was used interchangeably to prove all counts of the indictment; (c) the overt acts alleged to have been in furtherance of the conspiracy charged were also alleged in the aiding and abetting counts of the indictment; and (d) all of the participants specifically named in the conspiracy count participated in the offense charged in the aiding and abetting counts. Appellant's theory is based upon *United States v. Austin,* 529 F.2d 559 (6th Cir. 1975).

In *Austin* the defendant's conviction for aiding and abetting and for conspiring to commit the same substantive offense was set aside in part. The *Austin* court held that the defendant was denied his Fifth Amendment right against double punishment when he received sentences for both aiding and abetting as well as conspiracy. In reaching this conclusion the court found that:

> [E]ssentially the same evidence in this case was relied upon to prove both the conspiracy count and the substantive offenses. The proof was offered indiscriminately on all three counts and it would be difficult, if not impossible, to weed out any item of evidence that was not pertinent to all counts. The overt acts in the fourth count [charging conspiracy] were all relevant in proving the substantive offenses [aiding and abetting] as well as the conspiracy. Indeed, one overt act specifically alleged in the conspiracy

count, i. e., delivery of the automobile to appellant, is also alleged in substance in substantive count three. Further, substantive counts one and three allege in effect the same concert of action or agreement as alleged in the conspiracy count and as established by the proof. The objects of the alleged conspiracy were to bring about or accomplish violations of the same statutes on which counts one and three are based. Although the participants are not identified by name as being identical in the three counts, all participants named in count four were in fact agents of American Motors with the exception of the appellant. Further, as shown by the proof, all of the participants specifically named in the conspiracy count took part in one way or another in accomplishing the offenses charged in the substantive counts. . .

> In the present case, however, the substantive offenses charged in counts one and three in effect charged the same agreement or concert of action on the part of Austin and others, as charged in the conspiracy count. Since proof of the substantive offenses, as alleged in counts one and three of the indictment, also proved every essential element of the conspiracy, as charged in count four, appellant was doubly punished in violation of the Fifth Amendment.

529 F.2d at 563–64.

Defendant maintains that the facts of this case fall squarely within the *Austin* paradigm: essentially the same evidence was relied upon to prove both offenses; the evidence was offered, for the most part,

---

**11.** Not all the evidence offered at trial was introduced indiscriminately. On several occasions, government counsel clearly identified the testimony being offered as going toward proof of a specific count in the indictment. However, the government never sought to segregate proof of aiding and abetting from proof of conspiracy. To that extent, the evidence was offered "indiscriminately" and *might* have been used by the trial court to support convictions for both classes of offenses. Militating against defendant's assertion is the district judge's rec-

ognition, before any testimony was offered, that the substantive and conspiracy counts were distinguishable.

> THE COURT: As you put up evidence relating to the substantive counts as distinguished from the conspiracy, will you tell me which count the evidence will relate to as you go along, so that I can keep some track of it—
>
> * * * * * *
>
> —as to what counts are or are not, may or may not be supported by evidence.

Record, vol. 1, at 17–18.

indiscriminately;[12] and the overt acts alleged in the conspiracy count were all relevant in proving the aiding and abetting counts.[13] Nevertheless precedent compels us to reject the teachings of *Austin*.[14]

■ In *Nye & Nissen v. United States*, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949), the Supreme Court of the United States affirmed one defendant's convictions for aiding and abetting as well as conspiracy. In rejecting appellant's contention that there was not sufficient evidence to support his conviction for aiding and abetting, the Court said: "The fact that some of [the] evidence may have served double duty by also supporting the charge of conspiracy is of course immaterial." 336 U.S. at 619, 69 S.Ct. at 770.

As discussed above, the Supreme Court, four years later, affirmed one petitioner's conviction for conspiracy as well as aiding and abetting, rejecting a claim of double jeopardy. *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1953). Citing *Nye & Nissen*, the Court held that:

> "[a]iding, abetting, and counseling are not terms which presuppose the existence of an agreement. Those terms have a broader application, making the defend-

ant a principal where he consciously shares in a criminal act, *regardless of the existence of a conspiracy. Nye & Nissen v. United States*, supra, 336 U.S. at page 620, 69 S.Ct. at page 770. Thus, the charge of conspiracy requires proof not essential to the convictions on the substantive offenses—proof of an agreement to commit an offense against the United States . . ."

347 U.S. at 11–12, 74 S.Ct. at 364 (emphasis added). Although not stated expressly in *Pereira*, it appears that the same evidence was used to support the conspiracy conviction as that underlying the aiding and abetting.

Under *Nye & Nissen* and *Pereira*, therefore, we hold that there is no violation of a defendant's Fifth Amendment right against double jeopardy when convicted and punished for aiding and abetting as well as conspiring to commit the same offense even where the evidence adduced serves "double duty" in establishing the elements of both offenses. *Cf. United States v. James*, 528 F.2d 999, 1015 (5th Cir. 1976), *cert. denied*, 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976), where this court rejected defend-

---

12. *See* note 11, *supra*, and accompanying text.

13. Paragraphs one through eight of Count 1 of the indictment were incorporated by reference into Counts 2 through 12. Hence, all twelve aiding and abetting counts alleged that defendants—Madden, Suggs, and Cowart—aided and abetted each other in devising a scheme to defraud lending institutions. The scheme was alleged to have various components: deceiving lending institutions into believing prospective borrowers had satisfactory repayment ability by ordering credit reports without required "legals" and furnishing fictitious credit references; representing to Charter that the required minimum five percent down payment for conventional mortgage loans had been paid by purchasers; placing an advertisement in a local newspaper offering one hundred percent financing; creating artificial and temporary balances in purchasers' bank accounts through the VOD procedure outlined above; certifying in various real estate closing documents that the required down payment had been or would be paid by prospective purchasers; and making various misrepresentations concerning borrowers' financial qualifications to obtain mortgage loans, the completeness of credit reports, and that borrowers had actually paid the necessary

down payment. All of these allegations, contained in paragraphs one through eight of Count 1, were incorporated by reference in paragraph three of Count 13, the conspiracy count, as overt acts in furtherance of the conspiracy. The *only other overt acts specifically* alleged in count 13 were: (a) Cowart instructing C & S Realty employees to purchase cashier's checks at Cobb County Bank with the insufficient funds checks obtained from prospective borrowers; and (2) Madden's submission of more than three dozen inflated verifications of deposit forms to Charter in Jacksonville during the course of the conspiracy. These overt acts arguably fall within the general allegations in the aiding and abetting counts dealing with the VOD procedure.

14. We note that the Sixth Circuit has limited *Austin* to those situations in which an indictment is drawn in such a way that the substantive offenses in effect charge the same agreement or concert of action involving the defendant and the other individuals charged in the conspiracy count. *See United States v. Fife*, 573 F.2d 369, 373 (6th Cir. 1976).

ant's contention that there was insufficient evidence to support his conviction for aiding and abetting, finding that the evidence supporting the conspiracy conviction was a more than adequate evidentiary basis. This approach is consistent with that taken by the Fourth Circuit in *United States v. Peterson*, 524 F.2d 167 (4th Cir. 1975), *cert. denied*, 423 U.S. 1088, 96 S.Ct. 881, 47 L.Ed.2d 99 (1976).

In *Peterson* one defendant had been indicted in Count One for conspiracy and in Count Two for the substantive offense of bank robbery. He was convicted on both counts, with his conviction for bank robbery being predicated on a finding that he was an aider and abettor. On appeal, the issue was whether the convictions on both counts was multiplicitous—whether conspiracy to rob a bank was equivalent in the law to aiding and abetting the commission of bank robbery. The Fourth Circuit rejected this position.

 Cowart's conviction for aiding and abetting the offense of wire fraud was in no way dependent upon a finding of conspiratorial agreement. The fact that most of the evidence served "double duty" in proving the elements of both offenses is of no consequence. *Cf. Iannelli v. United States*, 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1294, 43 L.Ed.2d 616 (1975) ("If each [offense] requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes."). The other points raised—indiscriminate introduction of evidence and overlap in factual allegations—are also without merit: for the purpose of double jeopardy analysis, the dispositive fact is that the offense of conspiracy requires proof of an element—conspiratorial agreement—which the crime of

aiding and abetting does not. *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). We conclude that neither appellant's conviction nor his punishment for both offenses is violative of the double jeopardy clause.[15]

## III. SUFFICIENCY OF EVIDENCE

Appellant's second contention is that there was insufficient evidence to establish that he aided and abetted those individuals who committed the offense of wire fraud. Cowart claims that the evidence fails to support a conviction for aiding and abetting under the standard enunciated in *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977):

> The mere presence of a defendant where a crime is being committed, even when coupled with knowledge by the defendant that a crime is being committed or the mere negative acquiescence by a defendant in the criminal conduct of others, even with guilty knowledge, is not sufficient to establish aiding and abetting. An aider and abettor must have some interest in the criminal venture.

In defendant's view, the evidence only establishes that he negatively acquiesced in the illicit conduct of his employees. This contention is meritless.

 The question presented is "whether the evidence, and all reasonable inferences favorable to the government's position, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), are such that the [trier of fact, the district judge,] could reasonably and logically infer that appellant was guilty beyond a reasonable doubt of aiding and abetting [the commission of wire fraud]." *United States v. Longoria*, 569 F.2d 422, 424 (5th Cir. 1978).[16]

**15.** We also find meritless appellant's argument that Wharton's Rule prohibits his conviction for both aiding and abetting as well as conspiracy. Even if the Rule does apply to the offense of aiding and abetting, a difficult question with no certain answer, we find that the Rule's Third Party Exception would remove any prohibition against conviction and punishment for both offenses. *See generally Iannelli v. United States*, 420 U.S. 770, 773–86, 95 S.Ct. 1284, 1288–94,

43 L.Ed.2d 616 (1975); *Curtis v. United States*, 546 F.2d 1188, 1190 (5th Cir. 1977), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977).

**16.** Defendant suggests that a more stringent sufficiency of evidence test should be applied because his conviction is based upon circumstantial, rather than direct evidence. It is firmly established that the same standard of review

As set forth by this Court in *Longoria,* a conviction for aiding and abetting can be upheld only if the evidence demonstrates that:

"defendant was associated with the criminal venture, participated in it as something he wished to bring about, and sought by his actions to make it succeed." *United States v. Martinez,* [555 F.2d 1269 (5th Cir. 1977)], *United States. v. Anthony,* 474 F.2d 770 (5th Cir. 1973). To prove association, there must be evidence to establish that the defendant "shared in the criminal intent of the principal." *United States v. Smith,* 546 F.2d 1275 (5th Cir. 1977). To prove participation, there must be evidence to establish that the defendant engaged in some affirmative conduct; that is, there must be evidence that defendant committed an overt act designed to aid in the success of the venture. Proof of mere negative acquiescence will not suffice. *United States v. Martinez, supra; United States v. Smith, supra.*"

569 F.2d at 425 (emphasis in original).

The evidence set out above [17] is more than ample to satisfy the *Longoria* standards. Association is founded upon Condit's testimony that Madden instructed her to call Cowart whenever a loan applicant was "low on salary" or did not list a sufficient number of credit references, as well as Cowart's responses to Condit's calls. Participation may be found in the testimony of C & S Realty salespeople Corder and Gray that Cowart personally instructed them in the VOD procedure, Cowart's purchasing of cashier's checks, Cowart's endorsement of worthless deposit checks, Cowart's certification in various documents that bona fide down payments had been made, and the placement of an advertisement in a local newspaper in which C & S Realty offered one hundred percent financing. Moreover, sufficient evidence to support Cowart's conviction may be found in his own testimony.

Cowart admitted, during his own testimony, that: he knew the purchaser's checks were utterly worthless; he never got a down payment of any kind from *any* of the people named in the indictment; he personally advised Gray and Corder how to handle verifications of deposit; he purchased cashier's checks with the worthless purchaser's checks; and he signed the affidavits stating that he received down payments when he never received any cash, just a worthless check. *See* Record, vol. 3, at 25, 27, 31; *id.,* vol. 2, at 176, 177. Cowart's response to one question on cross-examination is particularly enlightening.

QUESTION: You're telling us that you and your agents did not personally instruct the purchasers in evidence today that you could provide one hundred percent financing for them?

ANSWER: Well, as I say, with the procedure that we used, in effect, the customer got a hundred percent financing.

But we felt that we had a house worth thirty thousand dollars, for instance, and we were selling it for twenty-six. And we felt that the, effectively, the down payment had been made. That's all I can say.

Record, vol. 3, at 37.

No more need be said. There is no merit to defendant's contention that his conviction for aiding and abetting is not supported by sufficient evidence.

The judgment of conviction is

AFFIRMED.

---

is employed when reviewing a conviction whether it is based upon direct or circumstantial evidence. *United States v. Palacios,* 556 F.2d 1359, 1364 (5th Cir. 1977); *United States v. Smith,* 546 F.2d 1275, 1283–84 & nn. 2, 3 (5th Cir. 1977); *United States v. Bright,* 541 F.2d 471, 476 n. 5, 479 n. 11 (5th Cir. 1976), *cert.* denied, 430 U.S. 935, 97 S.Ct. 1560, 51 L.Ed.2d 780 (1977). *See generally Holland v. United States,* 348 U.S. 121, 139–40, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954).

**17.** *See* Part I, *supra.*