852 F.2d 569
 RICO Bus.Disp.Guide 6997
 Robert J. SCHNEIDER, Plaintiff-Appellant,
v.
Donald B. QUALTERS and Gary L. Cantor, Defendants-Appellees.
 No. 87-3405.
 United States Court of Appeals, Sixth Circuit.
 July 21, 1988.
 
 Before MILBURN, RALPH B. GUY, Jr., and ALAN E. NORRIS, Circuit Judges.
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 This case essentially involves a salary dispute between the three shareholders of a closely held corporation. Plaintiff, Robert Schneider, filed suit in state court against the other two stock holders, Donald Qualters and Gary Cantor, after they had voted to discontinue plaintiff's salary. Plaintiff's first complaint consisted of five counts, including an alleged violation of the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C. Secs. 1961-68, and four additional state law causes of action. Following the grant of defendants' petition for removal to federal court, plaintiff filed an amended complaint which contained an additional sixth count alleging a violation of the Federal Securities Act of 1933 (1933 Act), 15 U.S.C. Sec. 771. Defendants moved for summary judgment on counts one through five. Plaintiff responded with a brief in opposition. In their reply brief, defendants also requested summary judgment in their favor on count six. The district court granted defendants' motion for summary judgment on the federal claims contained in counts one and six, and dismissed the remaining pendent state law claims without prejudice. Plaintiff appealed.
 
 I.
 
 2
 In May 1981, defendant, Gary Cantor, a computer programmer, incorporated Medical Processing Center, Inc. (MPC). The business specialized in the processing of third-party billings for the medical profession. Initially, Cantor was the sole shareholder. The other defendant, Donald Qualters, began to work for MPC as a salesman in September 1981. The record is somewhat unclear as to the exact terms of the agreement, but it appears that Qualters agreed to work without a salary until the business got off the ground. Qualters eventually became an equity partner in the business.
 
 
 3
 At the time he formed MPC, Cantor worked as a computer programmer for Patio Enclosures, Inc., which was owned by plaintiff, Robert Schneider. In March or April of 1982, Cantor approached Schneider about the possibility of investing in MPC. Cantor explained that he and Qualters were working without salaries and that they had exhausted their personal assets. The fledgling business was experiencing cash-flow problems and was in desperate need of an immediate infusion of capital. Schneider agreed to extend credit up to $50,000. In return, the defendants agreed to pay 15% interest on the loan over an indefinite period until the company was in a financial position that would allow it to retire the debt. The defendants also gave Schneider an option to purchase one-third of the MPC stock for $500. In addition, it was agreed that Cantor and Qualters would limit their salaries to $250 per week and $500 per week, respectively, until such time as the loan was paid off.
 
 
 4
 The foregoing facts are undisputed. Plaintiff, however, alleges that there was an additional oral agreement whereby Cantor and Qualters agreed that "after the salary payments and loan repayments as specified above, all additional monies taken out of the Corporation by the three principals were to be awarded one-third, one-third, one-third." Defendants deny the existence of this additional agreement. The record contains an unsigned copy of a loan agreement which reflects the $50,000 amount with an interest rate set at 15% over an indefinite period. It also shows the salary limitations and a prohibition on bonuses and dividends until the loan was repaid. The document does not, however, contain any reference to the additional agreement to give Schneider an equal share of all distributions of the company's assets.
 
 
 5
 In September 1982, MPC leased office space in the building owned by Schneider's company, Patio Enclosures, Inc. In addition, Patio Enclosures purchased a computer which it leased to MPC. Neither the office space nor the computer were covered by a written lease. Instead, the parties operated on an informal basis relying on oral agreements. In his deposition, Schneider claimed that the business continued to struggle because of inefficient management. Therefore, Schneider relieved Cantor of his programming duties at Patio Enclosures in order to allow Cantor to work at MPC full time. Accordingly, Schneider agreed to allow Cantor to raise his salary at MPC from $250 per week to $500 per week. In addition, Schneider "volunteered" to provide advice and assistance in establishing a bookkeeping system and operational procedures for MPC.
 
 
 6
 Eventually, the business began to prosper and, in November 1983, MPC was able to pay off the $36,000 it had borrowed from Schneider, including interest. Shortly thereafter, Cantor and Qualters informed Schneider that they intended to increase their salaries by $300 per week. Schneider objected and claimed that he was entitled to share equally in any funds distributed from the corporation over and above the $500 salary limits. Defendants claim that they did not remember that part of the agreement. Nevertheless, according to their deposition testimony, they decided to accede to Schneider's demand since they leased most of their equipment and their office space from him and therefore were dependent on his continued good will.
 
 
 7
 In his deposition testimony, Cantor admitted that he and Qualters intended to halt the payments to Schneider as soon as MPC was no longer leasing office space and equipment from Patio Enclosures, Inc. Apparently, defendants did not inform Schneider of their plan to eventually terminate the payments and Schneider continued to provide occasional advice and consulting services. The defendants also continued to lease equipment and office space from Schneider's company.
 
 
 8
 In early 1984, Schneider informed defendants that he intended to exercise his option to purchase 250 shares of MPC (one-third of the total shares) for $500. The stock purchase was finally consummated in November of 1984. Plaintiff was appointed to the board of directors of MPC on April 1, 1984. It appears that defendant Qualters also exercised his option to purchase the remaining third of the shares of MPC. Qualters had already been serving as both an officer of the company and a member of the board of directors since 1982.
 
 
 9
 In June 1985, MPC's lease with Patio Enclosures expired and MPC relocated its operation to another site. In November 1985, defendants told Schneider that they intended to terminate his salary because he was no longer performing any services for MPC. The record contains three letters written by MPC's attorney, Howard Kasdan, to plaintiff with regard to the impending termination of his salary. On December 31, 1985, the board of directors voted two to one to discontinue Schneider's salary. This action was subsequently ratified by a two to one vote of the shareholders in April 1986.
 
 
 10
 The parties were unable to negotiate a mutually satisfactory price for the purchase of plaintiff's stock in MPC. Accordingly, plaintiff filed suit in December 1985.
 
 II.
 
 11
 In its order granting defendants' motion for summary judgment, the district court accepted as true the plaintiff's allegation that the parties had entered into an oral agreement in 1982 whereby plaintiff was entitled to one-third of all funds taken out of the corporation over and above the salaries paid to defendants. Nevertheless, the district court held that defendants were entitled to summary judgment on both the RICO and the federal securities claims.
 
 
 12
 With respect to the RICO claim, the district court found a number of faults in plaintiff's argument. First, the court found that plaintiff had failed to allege sufficient facts to establish a "pattern of racketeering activities," as is required under 18 U.S.C. Sec. 1962. Moreover, the district court also suggested plaintiff could not even establish fraud on the part of defendants but, rather, at most had stated a claim for breach of contract. Since there was no evidence of a fraudulent intent, and since fraudulent intent is an essential element of mail fraud and wire fraud, the court concluded that plaintiff could not prove the predicate offenses necessary to establish a RICO violation.
 
 
 13
 Based on its resolution of the RICO claim, the court decided that it should also exercise its discretion to consider the merits of plaintiff's securities claim sua sponte, even though defendants had not included that count in their initial motion for summary judgment. The court noted that the plaintiff's complaint did not set forth a specific misstatement of fact or a material omission on the part of defendants which is necessary to state a claim under section 12 of the Securities Act of 1933, 15 U.S.C. Sec. 771. The court assumed that the plaintiff's claim was based on his previous allegation that defendants had fraudulently induced him to loan MPC money in return for an option on one-third of the shares and a further promise to divide all asset distributions equally. The court noted that MPC had performed its obligation with respect to the stock by granting plaintiff an option and then allowing him to exercise it in 1984. The court then found that there was no evidence to show that defendants had agreed to continue making payments to the plaintiff indefinitely. The court also concluded that the defendants were not obligated to disclose their intent to eventually terminate plaintiff's salary. Finally, the district court found that the granting of the option and the subsequent exercise of the option by plaintiff lacked the requisite interstate nexus necessary to establish a claim under 15 U.S.C. Sec. 771. Having disposed of all of plaintiff's federal claims, the district court dismissed without prejudice the remaining pendent state law claims.
 
 III.
 
 14
 On appeal, plaintiff raises several claims of error. In regard to the RICO claim, plaintiff contends that the district court erred in finding insufficient evidence of fraudulent intent or insufficient relationship between the fraudulent scheme and the use of mailings and the use of wires. Plaintiff also claims that the district court erred as a matter of law by adopting a narrow interpretation of the phrase "pattern of racketeering."
 
 
 15
 Plaintiff also argues that the district court should not have addressed the securities claim raised in count six sua sponte. Although he admits that the sections were not specifically cited in his second amended complaint, plaintiff nevertheless argues that the facts alleged in the complaint also give rise to violations of 15 U.S.C. Secs. 78q and 781. In addition, plaintiff contends that there were numerous disputed issues of fact which precluded summary judgment in favor of defendants.
 
 
 16
 We address the plaintiff's RICO claim and securities claims seriatim.
 
 
 17
 The standard for granting summary judgment under Fed.R.Civ.P. 56(c) is well established:
 
 
 18
 Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. "[T]he standard [for granting summary judgment] mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)...." Anderson v. Liberty Lobby, Inc., --- U.S. ---- (1986).
 
 
 19
 Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Since the grant of summary judgment is a "matter of law," our review of the district court's decision is de novo.
 
 A. RICO
 
 20
 Plaintiff alleges that defendants violated 18 U.S.C. Sec. 1962(c), which provides:
 
 
 21
 It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 
 
 22
 In Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985), the Supreme Court set forth the elements which must be alleged to state a claim under section 1962(c): "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." 473 U.S. at 496.
 
 
 23
 The definitional section of the RICO statute provides that " 'a pattern of racketeering activity' requires at least two acts of racketeering activity...." 18 U.S.C. Sec. 1961(1). Mail fraud, 18 U.S.C. Sec. 1341, and wire fraud, 18 U.S.C. Sec. 1343, are among the offenses enumerated under the statutory definition of "racketeering activity" as set forth in 18 U.S.C. Sec. 1961(5). The elements of mail fraud are (1) a scheme to defraud and (2) use of the mails in furtherance of the scheme. Pereira v. United States, 347 U.S. 1, 8 (1954). The elements of wire fraud are (1) a scheme to defraud and (2) use of an interstate electronic communication in furtherance of the scheme. United States v. Cowart, 595 F.2d 1023 (5th Cir.1979).
 
 
 24
 In the instant case, plaintiff alleges that the defendants conducted the activities of MPC through a pattern of racketeering activity. Specifically, plaintiff contends that defendants formulated a fraudulent scheme to induce him to loan money to MPC by falsely promising him that he would be allowed to share equally in any money distributed by the corporation over and above the defendants' salary of $500 per week. In addition, plaintiff alleged that several communications via mail and wire took place between the parties regarding their business arrangement. Plaintiff claims that these communications were in furtherance of the defendants' fraudulent scheme because they were intended to lull him into a false sense of security regarding his right to share in the company's profits.[1] Thus, plaintiff concludes that these alleged acts of mail and wire fraud amount to a "pattern of racketeering activity" in violation of 18 U.S.C. Sec. 1961(c).
 
 
 25
 As previously noted, the district court found that defendants were entitled to summary judgment on plaintiff's RICO claim because (1) plaintiff had failed to present sufficient evidence of a fraudulent scheme, (2) plaintiff had failed to show that the alleged communications were in furtherance of the alleged scheme, and (3) the alleged acts of mail and wire fraud could not amount to a "pattern of racketeering activity" under RICO.
 
 
 26
 We need not address the latter issues because we agree with the district court that the plaintiff's allegations concerning a fraudulent scheme were insufficient to withstand defendants' motion for summary judgment.
 
 
 27
 We begin by noting some obvious differences which distinguish the scheme alleged by plaintiff in the instant case from the classic types of fraudulent investment schemes. First and foremost, plaintiff did not simply give the money to MPC but, rather, he loaned it at a 15% rate of interest. The records shows that the principal was repaid to plaintiff with interest. In addition to the interest payments, plaintiff also received an option to purchase a one-third equity interest in the company for $500. Once again, the record shows that the option was indeed granted and was subsequently honored when plaintiff chose to exercise it. Thus, the undisputed evidence in the record clearly demonstrates that the defendants fully complied with all the written terms of the 1982 loan agreement. Therefore, the only basis for plaintiff's claim of fraud is the alleged existence of the additional oral agreement to divide the cash distributions which, according to plaintiff, the defendants falsely promised as a further inducement to extend credit.
 
 
 28
 We also note that, unlike most fraud cases, the plaintiff here does not allege that the defendants made a false misrepresentation regarding a factual matter relating to the past or present, such as their financial condition or the nature of their business. Instead, the only misrepresentation alleged by the plaintiff concerns the defendants' states of mind at the time they entered into the loan agreement, i.e., plaintiff claims that defendants entered into the 1982 oral agreement with the subjective intention to discontinue the payments to plaintiff as soon as MPC could operate without plaintiff's financial and managerial assistance. In support of his theory, plaintiff cites to our decision in Dunn Appraisal v. Honeywell Information Systems, Inc., 687 F.2d 877 (6th Cir.1982), wherein this court stated:
 
 
 29
 Although the general rule is that fraud cannot be predicated upon a representation concerning a future event, a statement concerning what the speaker intends to do in the future stands upon a different footing. A promise made with a present intention not to perform it is a misrepresentation of an existing fact, i.e., the speaker's present state of mind, and if such a false representation induces the other party to enter into a contract, the contract may be avoided.
 
 
 30
 687 F.2d at 883 (citations omitted).
 
 
 31
 We find that our previous ruling in Dunn is inapplicable in the instant case. Dunn was a diversity case involving state law claims for fraud and breach of contract arising from the lease of a computer to a small business. The business owner claimed that he fraudulently induced to lease a computer system which proved incompatible with his business operation. Specifically, plaintiff alleged that the salesman assured him that his existing computer programs could be easily adopted to the new computer and that Honeywell would pay for the conversion. Significantly, the evidence at trial indicated that the salesman had been told by another Honeywell employee that the conversion would not be feasible; nevertheless, the salesman continued to assure the plaintiff that there would not be any problems. Given these facts, we found that the trial court was not clearly erroneous in concluding that the defendants made false representations which induced the plaintiff to enter into the contract. Id. at 883.
 
 
 32
 In contrast to Dunn, there is no evidence in this case that defendants entered into the loan agreement with plaintiff with the knowledge that performance on their part was impossible. On the contrary, the facts show that defendants did abide by all the written provisions of the loan agreement. They repaid the money they had borrowed with interest; they honored plaintiff's demand to exercise his stock option; and they limited their salaries to $500 per week until the loan was paid off. Moreover, even assuming the existence of the additional oral agreement, as we must for purposes of ruling on summary judgment, the evidence shows that the defendants initially acceded to plaintiff's demand that he be allowed to share equally in any additional salaries paid by the company. The defendants' initial acquiesence to the demands made by plaintiff in 1983 and their subsequent refusal to continue the payments do not evince an intent on their part to fraudulently induce palintiff to enter into the loan agreement in 1982 by falsely promising that he would share in the salary increases. The most that can be inferred from these factual circumstances is that, at some point after the alleged agreement was made, the defendants decided to renege on their promise to share the salary increases with the plaintiff. There was full performance of the agreement for a considerable period of time. Proof of fraudulent intent is generally a matter of circumstantial evidence but the factual circumstances surrounding this transaction are simply insufficient as a matter of law to create an inference of fraud.
 
 
 33
 Plaintiff also claims that his claim of fraud is supported by direct evidence. Specifically, plaintiff relies heavily on a statement made by defendant Cantor during the course of his deposition in which he admits that he and defendant Qualters intended to terminate the plaintiff's salary as soon as MPC was no longer dependent on the lease arrangements with plaintiff's company. When read in context, Cantor's deposition statement shows he was referring to the time period in 1983 when plaintiff initially demanded that he be granted a salary comparable to the raises that defendants would receive. Cantor was not referring to his intent in 1982 when the original loan agreement was negotiated. Indeed, Cantor's testimony is perfectly consistent with the defendants' version of the facts, i.e., that there was no collateral oral agreement to divide the salaries paid by the corporation. Rather, defendants have consistently maintained that Schneider was not entitled to a salary and that they were coerced into paying him one after he threatened to terminate their leases. Defendant Cantor merely reiterated his position that there never was an oral agreement, that plaintiff was not entitled to a salary, and that at the time plaintiff demanded a salary, defendants felt compelled to accede to his demand. Such testimony is directly contrary to plaintiff's primary allegation regarding the alleged oral agreement and cannot be used to support plaintiff's secondary allegation regarding the specific intent of the defendants at the time they allegedly entered into the oral agreement because defendants have consistently maintained that no such agreement existed.
 
 
 34
 In any breach of contract case where one party refused to continue performance, the other party can always allege that the non-performing party entered into the contract with the specific intent to discontinue performance prior to the completion of the contract. Such an allegation, however, is merely speculation on the part of the aggrieved party, and the plaintiff cannot simply rely on the defendants' repudiation of the contract as evidence of a preconceived plan to defraud. Coerced payments made under protest do not provide evidence of a pre-existing oral agreement; nor do the protests establish an intent to defraud.
 
 
 35
 In sum, we find that the district court was correct in concluding that the plaintiff had failed to allege facts which would show a fraudulent intent on the part of the defendants. Accordingly, since the plaintiff could not show the requisite predicate offenses of mail fraud or wire fraud, we affirm the court's grant of summary judgment in favor of defendants on plaintiff's RICO claim.
 
 B. Securities Fraud
 
 36
 In count VI of his complaint, plaintiff alleged a violation of the Securities Act of 1933, 15 U.S.C. Sec. 77, et seq. The complaint did not state which particular section was supposedly violated nor did it specify a particular communication which may have contained a misrepresentation or omission. As previously noted, the defendants did not initially move for summary judgment on count VI but did subsequently request judgment on that count in their reply brief. The plaintiff also addressed the securities claim in his trial brief which he filed with the district court prior to the court's ruling on defendants' summary judgment motion. After granting defendants' motion for summary judgment on plaintiff's RICO claim, the court then proceeded to grant summary judgment on the securities claim sua sponte.
 
 
 37
 On appeal, plaintiff raises several claims of error. First, plaintiff contends that the district court erred by granting summary judgment sua sponte. We disagree. In Celotex, the Supreme Court stated that "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the losing party was on notice that she had the opportunity to come forward with all her evidence." 477 U.S. at 326.
 
 
 38
 In the instant case, plaintiff relied on the same theory of fraud to support both his RICO claim and his securities fraud claim. Given the alleged predicate offenses of mail fraud and wire fraud, the factual basis for both the RICO and the securities claims was nearly identical. Since the RICO claims were fully briefed by both parties, plaintiff had ample notice and opportunity to respond to defendants' factual contentions as they related to both claims. Moreover, the record shows that the defendants did address the legal arguments pertaining to alleged securities fraud in their reply brief and the plaintiff also addressed these arguments in his trial brief. Therefore, we find that the district court did not abuse its discretion by resolving the securities claim sua sponte in light of its ruling on the RICO claim.
 
 
 39
 Plaintiff also argues that summary judgment was inappropriate because the court only considered plaintiff's allegations under the Securities Act of 1933. 15 U.S.C. Sec. 77, et seq. On appeal, plaintiff argues that the facts alleged in the complaint also support a claim under the Securities Act of 1934. 15 U.S.C. Sec. 78a, et seq. Plaintiff admits that he never specifically raised this claim in his second amended complaint. We are not inclined to allow plaintiff to amend his complaint on appeal to allow for an additional claim. It is well established that parties cannot raise issues and arguments on appeal that were not presented to the trial court below. Holm v. American Ship Building Co., 276 F.2d 201, 203 (6th Cir.), cert. denied, 364 U.S. 819 (1960). Therefore, we decline to consider plaintiff's arguments on appeal as they relate to alleged violations of the Securities Act of 1934.
 
 
 40
 Plaintiff also argues that there was a material issue of fact which should have precluded a grant of summary judgment. Plaintiff's complaint did not specify which section of the 1933 Act was allegedly violated. The district court assumed plaintiff was attempting to state a claim under section 12 of the Act, 15 U.S.C. Sec. 771. Section 12(2) provides in pertinent part:
 
 
 41
 Any person who ... offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact ... shall be liable to the person purchasing the security from him....
 
 
 42
 15 U.S.C. Sec. 771(2).
 
 
 43
 Plaintiff's theory of securities fraud is based on essentially the same allegations used to support his claims of mail and wire fraud, i.e., defendants fraudulently promised to share corporate earnings with him on an equal basis as an inducement to loan money to MPC. These allegations standing alone would not be sufficient to prove the existence of a misstatement or omission of material fact. Plaintiff must show not only that defendants entered into such an agreement but that they entered into it with the specific intent to unilaterally terminate the agreement.
 
 
 44
 Plaintiff has not cited any evidence to suggest a misstatement or omission of a material fact which would support a claim under section 12. Accordingly, we find that defendants were entitled to summary judgment as a matter of law.
 
 
 45
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 In his second amended complaint, plaintiff alleges that he "engaged in several telephone calls" with defendants and their lawyer, Howard Kasdan, "in the late summer and early fall of 1984" regarding the exercise of plaintiff's stock option. Plaintiff also alleges that the defendants used the telephone to fire the corporate counsel, David Simon, and the company's accountant, Larry Schneider, both of whom were loyal to plaintiff, and that these actions were taken "in furtherance of the scheme to defraud plaintiff." Plaintiff also provided copies of three letters written by Howard Kasdan in November of 1985, informing plaintiff of defendants' decision to discontinue plaintiff's salary